## LEATH et al. v. BENTON ABSTRACT & TITLE CO.   (No. 11991.)

Court of Civil Appeals of Texas.   Fort Worth. July 14, 1928.

Rehearing Denied Sept. 29, 1928.

Luther Hoffman and Kilgore, Rogers & Montgomery, all of Wichita Falls, for appellants.

Bullington, Boone, Humphrey & King, of Wichita Falls, for appellee.

CONNER, C. J.   Appellee, an incorporated company, sued appellant Judd H. Leath and O. E. Beavers, alleging that the defendants were operating as partners in the purchase and sale of oil and gas leases in Schleicher county, or, if not partners, were jointly interested in certain leases and jointly engaged in an enterprise for their mutual benefit and profit in the sale of leases, and jointly and severally liable on obligations incurred in furtherance of the joint enterprise; that the plaintiff company was an abstractor engaged in the business of making, furnishing, copying, and certifying to abstracts of title to lands in Schleicher county; that on or about March 25, 1926, the defendants entered into a contract with the plaintiff whereby the plaintiff agreed to furnish, at the rate of 25 cents a sheet for originals and 10 cents a sheet for copies, abstracts of title to the following described lands and premises, to wit: Here follows a description of some 24 surveys and parcels of land.   It was further alleged that "in accordance with said agreement" the plaintiff prepared for delivery "an

original and three copies of abstract of title to said lands * * * and tendered delivery thereof to said defendants." It was alleged that the total aggregate amount due the plaintiff under the terms of its agreement was the sum of $1,312; that said sum was the reasonable value of plaintiff's services in the preparation and certificates of abstracts, and an itemized and verified bill was attached and made a part of the petition as an exhibit.

The defendants severally answered by verified plea, denying that they were partners or had ever been engaged in operations as such; and that the verified account was not due or correct. The defendant Leath specially alleged that it had been specifically agreed that plaintiff and this defendant had an express agreement to the effect that plaintiff would make abstracts covering certain lands in Schleicher county, correcting all objections to title raised, for a sum "in no event to exceed the sum of $700"; that before the work had proceeded to completion, the plaintiff was advised by certain of the landowners whose lands were being abstracted that their contract with him, Leath, had terminated and that he would not need further preparation of abstracts, whereupon the plaintiff had ceased to perform the work as originally intended and had not completed the abstracts as had been contemplated.

The defendant Beavers, in addition to his denial of partnership, the justness of the accounts, etc., as above stated, further specially alleged that prior to the date alleged in the petition of plaintiff, Leath was the owner or had contracted for the purchase of certain oil and gas leases covering the premises described in the petition from W. H. Whitten and others; that he (Beavers), to enable the defendant Leath to comply with his agreement with said Whitten and others, advanced and loaned to said Leath the sum of $6,000, taking as security therefor an assignment to an undivided one-half interest in the oil and gas leases which said Whitten and others had contracted to convey to the said Leath, and as additional security for the return of said $6,000 the said Leath assigned to Beavers a promissory note for $3,000, secured by a chattel mortgage on a standard rig, all of which was evidenced by a contract dated March 16, 1926, and duly filed for record in Schleicher county on the same day, of all of which plaintiff and its authorized officers were duly cognizant. Defendant Beavers further specially pleaded that while he is not liable for any part of the indebtedness sued on by the plaintiff, nevertheless, should he be held liable therefor on any part thereof, under the contract with defendant Leath he was not to be at any expense on account of the compilation of abstracts of title, which expense, if any, was to be borne by Leath, and he accordingly prayed for recovery over against Leath for any judgment that might be rendered against him (Beavers).

The case was submitted to a jury on special issues, in answer to which the jury found in separate issues that both Leath and Beavers had ordered the abstracts of title in question and that each had promised and agreed to pay the sum of $1,312, this also being the reasonable value of the services performed by the plaintiff in making the abstracts; that John F. Isaacs, the county clerk of Schleicher county and president of plaintiff company, did not "agree with Judd H. Leath that he would make the abstracts for a sum of money not to exceed $700," and that plaintiff had completed the abstracts "as it had agreed to do." There were several other findings that we do not think material to mention. Upon the findings so indicated, the court entered a judgment in favor of plaintiff against both defendants jointly and severally for the sum of $1,312, and the defendants have in due form prosecuted an appeal and assign error to the judgment.

■ We are of opinion that the court erred, and that the judgment is erroneous as to both defendants. Among other things of which the defendant Leath complains, it appears that the court refused to submit a special issue, requested by him, which sought a finding by the jury of the number of the original abstract sheets and the number of the copies prepared by the plaintiff company. He further complains of the matter presented in the following bill of exception, which was duly approved by the court, to wit:

"While the above-styled cause was being tried in this court, after the jury had received the charge of the court, and after all of the evidence had been closed, and while the jury was in the jury room considering its verdict, the court permitted the jury to have one of the abstracts of title involved in this suit reported to show the title to survey No. 35, block L1, certificate No. 54, T. C. Ry. Co. survey, while the counsel for the plaintiff was present in court, and counsels for defendants were absent, which said abstract of title was not offered in evidence upon the trial of the case, to which action of the court, in permitting said abstract of title to be placed in the hands of the jury, the defendants then and there excepted, in open court, and here and now tender this, their bill of exceptions, and ask that the same be examined, approved, and filed as a part of the record in this cause, this 25th day of November, 1927."

While of itself the action of the court in refusing to submit the special issue might not require a reversal of the judgment as against the defendant Leath, yet we find no reason why the defendant is not entitled to the finding requested. As shown in our statement of the pleadings, the contract declared upon by the plaintiff was not for a stated sum, but for "25 cents a sheet for the original and 10 cents a sheet for each copy." The precise number of such original sheets and

copies nowhere appears in the record. The number only appears by a statement of John F. Isaacs, to the effect that the originals and copies furnished at the price alleged approximated $1,312, and it certainly appears to us that the action recited in the bill of exceptions constitutes error. This is not denied, but in effect conceded, by counsel for appellee, as indeed it must be under a familiar line of authorities. Appellants defended the action stated in the bill upon the ground that the "entire transcript conclusively shows that appellants made no proof whatever that the jury even read the abstract, much less made any proof that any juror was influenced in the least thereby," citing in support of this contention the cases of West v. Houston Oil Co., 56 Tex. Civ. App. 341, 120 S. W. 228; Dunman v. South Texas Lumber Co., 252 S. W. 274. The cases cited are both decisions by Courts of Civil Appeals. In the case of Bell v. Blackwell, 283 S. W. 765, however, in an opinion by Mr. Justice Speer of section B of our Commission of Appeals, it was held that error requires reversal if there is reasonable doubt of its harmful effect, unless it affirmatively appears from the record that the error was harmless and actual prejudice is not necessary to authorize reversal thus stating the rule contrary to that insisted upon by appellee. Judge Speer cites, among others, the case of M. K. & T. Ry. Co. v. Hannig, 91 Tex. 347, 43 S. W. 508, where improper evidence was admitted. In that case Chief Justice Gaines of the Supreme Court said:

"The true rule is, that in such a case, in order to hold that the error does not require a reversal of the judgment, it ought clearly to appear that no injury could have resulted from the admission of the evidence. Since it does not so appear with reference to the testimony in question, the judgment must be set aside and a new trial awarded."

The case of Houston, & T. C. R. Co. v. Gray, 105 Tex. 42, 143 S. W. 606, was also cited with approval in the above case, in which Chief Justice Brown said:

"If the evidence taken by the trial judge left it reasonably doubtful as to the effect the statement had upon the amount of the verdict of the jury, we would feel inclined to exercise our authority and set it aside."

Mr. Justice Speer cites numerous cases upholding the rule indicated by the quotations made.

We have read the statement of facts and examined the record carefully, and feel unable to say that the action of the court in permitting the jury to receive the abstract which had not been introduced in evidence affirmatively appears to have been without prejudice. The abstract itself is not contained in the statement of facts, and we do not know the number of its sheets or the number of its copies, and we cannot say that the recitals therein were wholly without prejudicial tendency. Counsel for appellee, as shown by the bill here presented, must have been cognizant of the fact, and it does not appear that they objected. It is perhaps not a violent presumption that they at least thought its introduction before the jury would be favorable to their client. The fact that Mr. Isaacs, the president of the company and the county clerk who prepared the abstract, testified that the number of original sheets and copies at the price agreed upon approximated the total sum of $1,312, as shown by the account, was not conclusive. His testimony was sharply contradicted in material particulars by at least two of the witnesses, and the jury had the right to discredit him, he being a party in interest, and the abstract received by the jury may have had some tendency to corroborate his testimony. So that, on the whole, we feel unable to say, as stated, that the record affirmatively shows that the action of the court, as shown by the bill of exception quoted, affirmatively appears to have been harmless. We therefore think that the judgments below against the appellant Leath should be reversed and the cause remanded for another trial.

Appellant Beavers, on the trial after the introduction of the evidence, requested the court to give to the jury a peremptory instruction in his favor, and he assigns error to the action of the court in refusing such instruction. It will be recalled from our introductory statement that the plaintiff in the suit alleged that the defendant Beavers, as well as the defendant Leath, had ordered the abstract and also had agreed to pay therefor the sum charged. As relating to the alleged liability of defendant Beavers, the record discloses, substantially, that Beavers had nothing whatever to do with assembling the block of acreage and securing the drilling contract from the owners. The drilling contract from the owners had been secured by Leath in February, 1926. Those contracts were conditioned upon the drilling of a well by Leath within four months after title has been approved, the contract being left with a bank in escrow; that thereafter on the 16th day of March, 1926, prior to the approval of the titles or preparation of the abstracts of title, Beavers for the first time became connected with the enterprise. On that day the following contract was entered into between Leath and Beavers, to wit:

"The State of Texas, County of Schleicher:

"This contract and agreement, made March 16th, 1926, by and between Judd H. Leath, of Wichita Falls, Texas, as first party, and C. E. Beavers of Electra, Texas, as second party, witnesseth:

"First party represents that he is the owner and holder of certain oil and gas leases in Schleicher county, Texas, aggregating 8,160 acres, more or less, as shown by a certain escrow agreement and original oil and gas leases from various landowners now in the First National Bank of Eldorado, Texas, covering

the particular tracts of land hereinafter described, which agreement and leases are subject to acceptance by first party upon examination of the titles thereto, and subject to an agreement between first party and the respective landowners to commence a well for oil and gas purposes on some part of said land within forty-five days from date of the examinations and acceptance of titles as specified in said escrow contract, a copy of which contract is attached hereto and made a part of this instrument for identification purposes; and

"Whereas, first party desires to procure six thousand ($6,000.00) dollars with which to comply with said escrow contract and second party has agreed to furnish said money; therefore, it is hereby contracted and agreed by and between the parties hereto, as follows:

"Second party agrees to furnish and does hereby furnish first party the sum of six thousand ($6,000.00) dollars, the receipt of which is hereby acknowledged, to be used by first party for the purposes set forth in said escrow contract.

"First party agrees to sell, convey, transfer and assign to second party, a full undivided one-half interest in and to all of the oil and gas leases and leasehold estates covering the tracts of land herein described, which assignment shall be properly executed and delivered to second party immediately upon the acceptance by first party of the titles to said leases, or such thereof as he may accept after examination and approval.

"First party promises and agrees to repay second party said sum of six thousand ($6,000.00) dollars within one hundred and twenty (120) days from this date, provided that by such date a sufficient amount of said acreage shall have been sold to procure the funds with which to repay said sum of money to second party, but the final payment of said sum of money shall not be conditional upon the sales of such acreage, but shall be the personal obligation upon the first party.

"As additional security for the repayment of said sum of six thousand dollars, which is a direct personal obligation of the first party, said first party, as collateral security, hereby transfers, assigns and delivers to second party, one certain promissory note made by R. S. Stuchul, payable to the order of C. E. Beavers at Wichita Falls, Texas, for months after date for the principal sum of $3,000.00, bearing date of March 16, 1926, and bearing ten per cent. interest from date; which note is secured by chattel mortgage executed by the said R. S. Stuchl to C. E. Beavers, as same date of said note upon one standard rig, tools and equipment as described and contained in one chattel mortgage. Upon repayment of six thousand dollars, then said note and chattel mortgage are to be returned and released unto first party; but in the event of the failure or refusal of first party to repay said sum of money as specified herein, then and in that event, said note and chattel mortgage shall thereupon become the sole property of second party; who shall have and is hereby given all rights, title and interest in the same and all rights and remedies for the collection and enforcement of said property rights.

"In the event the first party does not use the six thousand dollars advanced to him by second party for the purpose stipulated in said escrow contract within thirty days from this date, he is given the right and option of returning said sum to second party, and agrees and obligates himself to do so; and in that event this contract for assignment of one-half interest in said leases hereinafter described the assignment thereof, together with the transfer and assignment of said note and chattel mortgage as collateral security, shall be of no further binding force and effect upon second party.

"The various leases and tracts of land to which this contract applies, consists of certain oil and gas leases made by J. H. Whitten and wife, Mollie Whitten, W. T. Whitten and wife, Lummie Ida Whitten, T. K. Jones and wife, Marie Jones; J. T. Jackson and wife, Mary Louise Jackson, made to Judd H. Leath, of date February 28th, 1926, and covering the following tracts of land in Schleicher county, Texas, to wit: (Here follows the description of some 24 parcels of land to which the agreement relates.)

"It is understood and agreed as part consideration for this contract, that second party shall not be personally liable for any part of the cost of expense of drilling, completing and equipping the first well for oil and gas purposes which may be drilled on any part of the above-described lands, but that all costs and expenses of same shall be paid by first party.

"From and after drilling and completion of said first well, and after first party shall have sold sufficient amount of the above-described acreage to repay the six thousand dollars, advanced by second party to first party, then all remaining acreage shall be held and owned jointly in equal undivided one-half interests by first and second party hereto, each owning and holding his respective interests in said acreage individually and not as a partner or as a partnership.

"Witness our hands, this the 16th day of March, A. D. 1926.
                    "P. H. Leath, First Party.
                    "C. E. Beavers, Second Party.
"Witness: H. J. Bruce.
"Filed for record this 26th day of March, 1926, at 5 o'clock p. m., and duly recorded this 31st day of March, 1926, at 2:30 o'clock p. m.
                    "John F. Isaacs, County Clerk,
                    "Schleicher County, Texas."

It seems clear to us that at the time of making this contract between Leath and Beavers, Leath only had a contingent interest in the lands in question. By the terms of his contract with the original owners of the land, the leases were to become effective and delivered to Leath on a condition that was never fulfilled, the evidence showing without dispute that Leath later abandoned all claims under the contract with the owners. Beavers, therefore, in no event acquired any real interest or estate in the lands which Leath had contracted with the owners to develop for oil and gas. The contract with Leath plainly shows that the $6,000 was a loan to Leath and not intended as a contribution in that amount in any joint enterprise. For the repayment of the loan Leath expressly obligated himself, giving in part security a $3,000 note secured by mortgage, and contracted to vest Beavers with an undivided one-half interest in the

leases to be acquired. The fact that Beavers was to become a joint owner with Leath, on Leath performing the conditions upon which his contract with the owners depended, is not sufficient to establish a partnership relation between Leath and Beavers. Of course, Beavers in a certain sense may be said to have been interested in desiring the success of Leath's undertaking, but no more so, we think, than any other person desiring to acquire interest in the leases. The lessors, the owners of the land, were interested in a general sense in the success of Leath's undertaking to develop the land, but such an interest did not constitute those owners partners with Leath in the sense that they became obligated to discharge obligations made by Leath in the prosecution of the enterprise. It is to be noted that the contract with Leath expressly provided that Beavers was not to be personally liable for any part of the expenses of drilling, completing, or equipping the first well for oil and gas, and that the extent of Beavers' interest as finally obtained was merely that Leath and Beavers were to own undivided one-half interests in the acreage "individually and not as partners or as partnership property."

The evidence on the part of appellee, to the effect that Beavers ordered the abstracts or agreed to pay therefor, is several general statements by the witness Isaacs to the effect that "they," referring to Leath and Beavers, ordered them, and that he offered to deliver the abstracts to "them." The evidence shows that Beavers was with Leath and others at the time the abstracts were contracted for by Leath, but Leath, Beavers, and the other persons referred to testified to the effect that Beavers did not order the abstracts nor agree to pay for them. Isaacs testified that Leath and Beavers came together to his office, and that a Mr. Nichols and Mr. Potter were with them, and that—

"As to whether or not it was Mr. Leath who ordered the abstracts from me, well, Mr. Leath was doing the principal talking. I think that he was doing all of the talking with reference to the abstract, except something that maybe Nichols might have said in connection with it. In other words, I took the order from Mr. Nichols, and whatever trade I made, I made with him."

Mr. Leath testified:

"It was on April the 2d when I ordered the abstract. That was when we four were there together. I did the ordering of that abstract, and the agreement to pay. Mr. Beavers did not have anything to do with that at all. Mr. Beavers was simply there in an advisory capacity. Mr. Beavers was not to pay anything with the exception of putting up $6,000."

We think that the expressions of Mr. Isaacs that "they" ordered the abstract, and that he offered to deliver it to "them," amount to no more than expressions of a mere opinion on his part that Beavers' relation with Leath was that of a partner and that the record as a whole otherwise so conclusively shows that Beavers' relation to the enterprise was not that of a partner, and that his interest in the enterprise was not such as to render him liable; that the judgment as to him should be reversed and here rendered in his favor.

The judgment below will accordingly be reversed, and the cause remanded in part and reversed and rendered in part, as indicated by the foregoing conclusions.