## No. 18,041.

ELMER J. SMALLER, ET AL. *v.* JAMES LEACH, ET AL.
(316 P. [2d] 1030)

Decided October 14, 1957. Rehearing denied November 12, 1957.

Messrs. STINEMEYER & STINEMEYER, Mr. ROGER M. BREYFOGLE, Mr. MAX C. WILSON, for plaintiffs in error.

Mr. JOHN STUMP WITCHER, for defendants in error.

*En Banc.*

MR. JUSTICE SUTTON delivered the opinion of the Court.

PLAINTIFFS in error were defendants and defendants in error were plaintiffs in the trial court. We will refer to them as they there appeared or by name.

The long record in this case details controverted material facts showing in substance that one of plaintiffs, Thomas E. Fontecchio, hereinafter sometimes referred to as Tom, with the use of a radio detection

instrument known as a scintillator, while prospecting on December 26, 1954, discovered a radioactive mineralized area containing uranium on Soapy Hill, near Hunky Dory Mountain, in Fremont County, Colorado. It is further disclosed that plaintiffs were the owners of the scintillator and had agreed to a division among themselves of anything found by its use and that Tom told defendants and one Perkins, all of whom accompanied him in his car on December 26, 1954, about his arrangements with his co-owners. Perkins is not involved in this controversy, having sold his interest to defendants. The area in question was prospected to some extent on that day. On December 30, 1954, Tom, Leach and Olson went to Canon City and remained over till the 31st. Though it had snowed they preceeded to Taylor's ranch and during those two days part of the area was again tested with the scintillator and similar "hot" results were obtained. It was determined that the area was open for locating claims and Tom wanted to do so on December 30th, but the others, though then prepared to stake, thought it better to examine the entire area more thoroughly. The parties discussed this rather fully during those two days.

Plaintiffs are employees of the Bureau of Internal Revenue in Denver, Colorado. Defendants are all married to sisters and reside in the Canon City area, Taylor also owning a ranch about one mile from the discovery site. John F. and Thomas E. Fontecchio are brothers. The record depicts a close, friendly and trusted friendship between the defendants and Tom prior to this controversy.

On the afternoon of December 26th, after digging at least two shallow test holes on Soapy Hill that reacted favorably to the scintillator, the parties started back to Canon City in Tom's car. He sat in the rear seat working the scintillator and while so doing brought up the question as to how the discovery should be owned. His testimony on this point, as well as that relating

to staking, was accepted by the trial court. We deem it unnecessary to repeat in detail this testimony. Suffice it to say that there was sufficient competent evidence to support the finding of the trial court that an oral grubstake contract was entered into on that day whereby the owners of the scintillator were to have 50% and those making the discovery 50% of any claims located as a result of the use of the scintillator.

When Tom returned to Denver he told his partners about the discovery and about his agreement with his brother and the others in Canon City. The Denver men then ratified the agreement. A bulldozer to trench part of the area had not been brought in on December 30th as agreed on December 26th. The scintillator was not left in Canon City on the December 30th-31st trip for it had been committed elsewhere but the Denver men offered to return it later for use at Soapy Hill.

On December 31st John T. Fontecchio did not go prospecting with his brother and Smaller, Leach and Olson when they searched another area. He came to Smaller's home later that day when the parties were again discussing what should be done with the Soapy Hill area. The trial court again accepted the testimony of Thomas E. Fontecchio when he testified concerning the staking of the claims. This pertinent part is:

"Q. Now, was anything said after that about this Soapy Hill area, about what would be done with anything in that area? A. * * * So, we were in there * * * when my brother John came in. We all sort of briefed Johnny as to what we found in the north of Canon area there. And Johnny asked me if it would be all right if he went up to Soapy and staked, started staking that stuff. Well, I told him that, sure, it would be fine, but when he started staking be sure he stakes, puts enough claims up there, because just as soon as the word gets óut everybody — I believe Johnny said everybody and his brother would be up there. Q. Now, did he or did he not indicate that would be for all of you or

for just himself? A. He did not — Johnny did not tell me that he was staking it for himself. In the course of all this conversation we were all talking as if we were all in on the deal, we were all working together. And that is the impression I had, that when he staked it was going to be for all of us."

It also appears that the first working day after December 26, 1954, Smaller (whose friend Rossi testified that Smaller was interested earlier in buying a counter) inquired from a local store about buying a Geiger Counter — an instrument that normally is less expensive and less powerful than a scintillator but which generally performs in the same manner. On the first business day after December 31, 1954, Smaller bought a counter. On January 8, 1955, Smaller and John T. Fontecchio checked a nearby working mine known as the Crescent with their new counter to compare it with Soapy Hill and promptly on the same day began to locate (stake) claims in the Soapy Hill area in defendants' names only. On January 12th or 13th, 1955, Thomas E. Fontecchio returned to Canon City and was disturbed because Smaller had bought a counter when the scintillator was to be made available. John T. Fontecchio then told Tom he had staked some claims at Soapy Hill (this was on January 8, 1955) because they had seen some airplanes and they were afraid someone else would discover the area and move in and stake it. The record shows that none of the plaintiffs were ever on more than a few of the 22 claims but that all of the claims are contiguous to each other. Tom testified that John told him *sotto voce* on the evening of December 31, 1954, when they were discussing the claims: "Don't worry, Tom, I'm looking after your interest." In February, 1955, Tom went to Soapy Hill to check a dozer cut with the scintillator. The Denver men could not take formal leave from their jobs with the United States Internal Revenue Bureau from January 1st to April 15th. However on March 30th Thomas E. Fontecchio, Grimes and Leach

came to Canon City to check on rumors they had heard, on about March 26th, that the defendants had staked 22 claims solely in defendants' names in the Soapy Hill area and were denying all rights of the plaintiffs. Controversy ensued over this on March 30th and plaintiffs filed suit soon thereafter (the original complaint is not in the record but their second amended complaint is and shows that it was lodged January 21, 1956) asking that they be declared the owners of a one-half interest in said claims, that Thomas E. Fontecchio be found to be the owner of another one-tenth because he was also one of the discoverers and for an accounting.

The record further shows that defendants since January 8, 1955, had not only staked claims solely in their own names and denied the rights of plaintiffs, but they also had opened a mine on one of the claims, shipped some ore and treated the property solely as their own. Their testimony generally agrees with that of plaintiffs as to dates, meetings and trips, but is contradictory to that of plaintiffs and was not accepted by the trial court on any material issues relating to ownership. Defendants as a separate defense to this action claimed abandonment, if there was any such agreement. We note that John T. Fontecchio's testimony even went so far as to deny on cross examination that he knew that on December 26, 1954, that the parties going out that day were going prospecting. Smaller's testimony on important questions on cross examination was evasive and filled with expressions such as "I can't really recollect" or "not to my knowledge". John T. Fontecchio on cross examination in reply to a question asking if the plaintiffs had found something at Soapy Hill on December 30th, 1954, would he (John) feel they (the plaintiffs) had an interest in it replied: "Well, sure, they would have, if they had staked it." Then, "Q. But if they had found something and it was later staked by some of their associates you would still feel that they had an interest in it, wouldn't you?" "A. Well, that would

depend on what type of arrangements were made — if there were any arrangements made."

Trial was to the court and after trial and based on ample evidence it expressly found, among other things, that:

1. " * * * I think from the evidence and the pleadings it can be said that there was an agreement of contract between parties as of December 26th, 1954."

2. Under all the evidence there was no abandonment and that plaintiffs' sole duty under the contract as it developed was to point out the area and that if the situation were reversed that defendants " * * * would have been here making the same claims that the plaintiffs now make."

3. " * * * it was optional with the defendants to accept the terms stated by the finder of the ore, the plaintiffs with their scintillator, and if they chose to go along, they had the obligation to do the staking, the posting and a reasonable search for ore. If ore was not found, then there was no profit to anybody. If it was found, they should share equally."

4. As to the accounting phase of the suit the court found that defendants proved expenses of their partnership known as Tallahasse Uranium Company in locating, mining and shipping ore from the claims of $30,255.66 and that only $12,341.93 of this was properly allowable as set offs (under C.R.S. '53, 92-23-2) due to plaintiffs' objections; that this left a balance of $17,913.73 to be set out against the includible receipts of $17,913.73; thus leaving a deficit of $899.74 with nothing to distribute.

The judgment of the trial court after the five day trial, and two day accounting hearing, was that:

1. Plaintiffs were found to be the owners of a half interest in the claims in question and defendants were required to hold title thereto in trust for them or transfer such interest to them.

2. Plaintiffs were entitled to an accounting from ore

sales and had this accounting with no net sum for distribution found to be available.

3. Defendants had sold the Lulu claims for $300.00 and that plaintiffs are entitled to $150.00 thereof and to one-half of any royalty interest reserved by defendants in said sale.

4. Motion for new trial was dispensed with.

Defendants are here by writ of error alleging six separate points which may be summarized as:

1. That the complaint sets forth a joint prospecting agreement, yet fails to allege a mineral discovery.

2. That a mineral discovery under the location statutes is necessary in this case.

3. That plaintiffs abandoned the area.

4. That a grubstake agreement to be valid requires that the claims be located during the existence of the contract, pursuant to it and with the consideration furnished and that such was not done here.

5. That there was no contract established.

6. That no fiduciary relationship was established or existed here.

Plaintiffs allege cross error in the denial of a tenth interest as a co-discoverer to Thomas E. Fontecchio and cross error in allowances on the accounting.

As we view the record this case turns primarily upon the question as to whether on December 26, 1954, a valid and binding contract was entered into (*and the scope thereof*) between the parties relating to the ownership of locations for possible uranium claims to be located on or near Soapy Hill. Since Hiroshima was leveled in World War II the world has seen the rise of the atomic era. The active search for the wonder elements uranium and thorium has thrilled as well as disturbed mankind. It has already wrought wondrous economic changes in many sectors of our state as well as other parts of the west and has brought the hope and partial realization of medical relief, scientific advances and cheap power to the world along with the threat

of destruction by atom and H bombs. It has in the instant case turned brother against brother in a bitter quest for riches by one and the hope of sustaining integrity as well as securing wealth in the other. Our mining laws were developed years ago, first out of customs and laws of the miners and their courts, later out of Acts of the Congress and the State Legislature. Since their adoption we have had the uranium rush which, because this mineral is not usually located like other minerals have been in the past, presents difficulties. See Volume 4, No. 2 Utah Law Review, article entitled "The Impact of the 'Uranium Boom' on Mining Laws." True it is that lodes of primary uranium ores have been found and may be noted by outcrops as well as radio activity; yet many secondary ores of this metal have been created by deposits of thermal waters or other means spreading the element in not only cracks, fissures, faults and fossilized trees, but also along stream and river channels and in old lake beds where no outcrops may exist. One of the most successful ways of discovering uranium, therefore, has been by means of radio detecting instruments and other modern scientific means such as fluorescent lights, photographic film, electroscope tests and even surface growing plant life. See page 218, volume 9, No. 3, Wyoming Law Journal article entitled "Valuable Mineral Discovery" and volume 27, No. 4, Rocky Mountain Law Review, page 409. The scintillator and Geiger Counter allowing gamma ray measurements have become as familiar in the west today as the gold pan and pick and shovel were in an earlier period. The old form of grubstake agreement whereby the man who had no time or aptitude for prospecting could furnish the burro, beans and bacon to another for a half share of any discoveries made, has its modern day version in the loaning to a friend, for the weekend, of one's scintillator or counter on shares of whatever is found. And, weekend instrument prospectors have made some of our largest and best dis-

coveries. Uranium itself, particularly the secondary minerals such as carnotite first sought by Thomas E. Fontecchio in the area in question, are often subject to thick layers of overburden. A radiometric anomaly may be found on the surface and yet no single piece of rock subjected to the scintillator may react or give a "count". This fact has resulted in the custom among those seeking uranium of staking all of an area that may be "hot"; i.e., an area that gives a radioactive count above the normal background reading caused by the normal radiations from the earth's crust and from cosmic rays. Once staking and recording of location notices have been done, then the expensive drilling and other searching are begun in earnest. As a practical matter the prospectors know that the real bonanza may lie some distance from the "hot spot". They also know that the moment a discovery is known to the public that others rush in and stake the surrounding lands, thus many times preventing the original discoverer from capitalizing on his efforts. The rule of *pedis possessio,* without the sanction of the Congress or our Legislature or judicial approval, has been enlarged by uranium prospectors to cover all the reasonable area on the public domain that one can stake with one or more claims, keep others off of, and either tunnel or excavate in, drill on or lease or sell to, others better able to do such work. (See 30 U.S.C.A. §28.) Thus it has resulted in the custom of finding a likely area, staking (locating), recording and then seeking discoveries in the mineral law sense to validate the claims. Such *sub rosa* claims blanket large segments of this and some other western states, cloud many titles, and of course are contrary to existing Colorado and federal statutes which first require mineral discovery, then location, then recording, though if no intervening rights have arisen it is recognized that locations improperly made may be validated by later legal discoveries.

In *Murley v. Ennis,* 2 Colo. 300, at p. 305, this court

said in connection with rights to possession after a mineral discovery:

"But if one acting for himself alone discovers in the public domain a mineral deposit, such as mentioned in the acts of Congress, he, by virtue of his discovery, merely becomes entitled to a reasonable length of time in which to perfect the development which the local law requires of him; and in the meantime he must be permitted to retain the possession of the premises without interference. His right while he proceeds with the work of development is as absolute as after the development is completed.

"The same is true where one enters upon a mine previously discovered, and to which the discoverer has lost his right by failing to make the development required by the law; from the moment of commencing the labor of development with the *bona fide* purpose to complete it, and so appropriate the mine, the party has a possession in fact, and for the time being a right to retain that possession."

This court recognizes that no Colorado or federal legislation has yet been enacted to expressly provide for the atomic era in radioactive mineral locating. No such laws exist expressly providing that valid discoveries can be made by radio detection devices, possibly because of the newness of the subject, or, because of fear of defective instruments, fraudulent claims, mistakes which may arise, the difficulty of determining on the ground as to whether claims have been validated by discoveries, or because not all radioactive areas are in fact valuable. It also appears that uranium itself at times may be "in balance"; viz., not give off any "count" or that the count may be far different than the chemical assay, which is the conclusive test.

Grubstake agreements have long been recognized in the western mining camps and by the courts. Such agreements must be definite and will only be enforced by the courts like other contracts. They must be sup-

ported by satisfactory proof of all the essential elements. They may be either oral or written and are not within the Statute of Frauds. *Lindley on Mines,* 3rd Edition, p. 2119 et seq.; *Murley v. Ennis,* supra, at 304. Also see 58 C.J.S., §251 c, p. 709.

"It is essential to a right in property under a grubstake contract that such property should be acquired by means of the grubstake furnished and pursuant to a grubstake contract as well as during its existence; but, where these essentials exist, all the parties acquire an interest in all of the claims located. * * * *In the absence of an agreement or circumstances indicating the contrary,* a prospecting partnership terminates with the expedition undertaken pursuant thereto. Such partnership is also determinable as to the interest of any of the parties at the pleasure of such parties; *but such determination is subject to equitable restrictions and cannot operate to defeat rights which have accrued in virtue of its covenants while it was in force."* Emphasis supplied.) 58 C.J.S. 705, § 249.

Defendants have cited *McLaughlin v. Thompson,* 2 Colo. App. 135, 29 Pac. 816, as authority for denying plaintiff's grubstake rights. That was a case where one of two joint prospectors failed to continue his share of the discovery work or to contribute thereto with no agreement as to his rights when he quit. That case is not applicable to these facts where plaintiffs neither quit nor abandoned their discovery or the contract and where the defendants who stood in a position of trust and confidence without consent located (i.e. staked) the claims solely in their own names. Obviously defendants could not unilaterally abrogate the contract. In *Johnstone v. Robinson,* 16 Fed. 903, at 905, upon somewhat different facts the court said:

"Upon this statement of facts I deem it only necessary to say that, in my view, the partnership relation, or—if it be not called a partnership relation, but by some other name—the association between parties who may be en-

gaged in prosecuting exploration in the public lands for mines, *must exist at the time of the alleged discovery and location, in order to give to the parties associated an interest in the property. If it does not then exist, so that the person acting in the field, making the discovery and location, can be said to be acting for the others as well as himself, no interest can be acquired by those who are not personally present.*" (Emphasis supplied.)

 In the instant case the contract came into existence at the time of discovery of the area and continued on through the location of the claims. Here, the defendants after preparing to stake the claims with some of plaintiffs went out a few days later and staked them for themselves. Equity must imply that defendants under these facts were acting for both plaintiffs and defendants, for it is clear that defendants were drawn to the Soapy Hill area solely because of the plaintiffs' scintillator action on December 26th and the contract which arose that day. It is that knowledge used in bad faith that resulted in the 22 claims being staked solely by defendants.

Defendants cite as authority to prove abandonment *Murley v. Ennis,* supra. There plaintiffs alleged, among other things, that they had agreed to furnish defendant certain supplies, and defendant in turn was to discover and locate mineral lodes. That case turned upon the failure of plaintiffs to carry out their part of the agreement and as to this point the *Murley* case does not apply here.

The instant case is similar to *Sears v. Collins,* 5 Colo. 492, where this court found for the plaintiff. There the court in the statement of facts said:

" * * * in consideration of the information given by Collins (plaintiff) to Sears (defendant) concerning the place where the fragments of ore had been found, Sears agreed to go there and prospect and search for lodes, and that any and all such as he might find he would locate in the joint names of the two parties, each own-

ing an undivided half, and that Collins (plaintiff) was to pay one-half of the expenses of such location and work in prospecting and developing the finds."

Here the information concerning the location of the radiometric anomaly (which is more than float, but which may or may not be wholly within the definition of a mineral discovery under the statutes as defined in *Lindley on Mines,* Third Edition, Vol. 2, p. 777) was sufficient consideration to defendants to bind them to the agreement tendered by Tom. Equity will not permit defendants to later use such consideration solely for their own benefit.

Defendants cite *Bradley v. Andrews,* 91 Colo. 378, 14 P. (2d) 1086, as authority to show that good faith is not required by a grubstake. We do not so view that case. There the grubstakor violated his contract and the court held that the grubstakee could proceed to use for himself the information honestly acquired during the existence of the oil and gas grubstake.

*Lindley on Mines,* supra, beginning at page 2119, discusses grubstake contracts and in speaking of equitable rights of the parties and of the degree of proof necessary, at page 2121 says:

"While there is no element of trust existing between tenants in common of mining property who are partners only for the purpose of exploration, in cases of 'grubstake' or prospecting contracts, where discoveries are made, the prospector may take no unfair advantage of his associate in dealing with the property. If he does, he will be held to account for the profits derived from his unfair practices. Every principle of equity on which are sustained resulting trusts is applicable to such a case. * * *

"The 'grubstake' contract, properly speaking, applies to the search for and location of mines on the public domain.

* * *

"The line of demarcation between the ordinary "grub-

stake' contract and a partnership is sometimes difficult to determine. Generally, it may be said that if the agreement extends beyond the discovery and location, and contains a stipulation for exploiting and developing, a mining partnership arises when actual work commences.

"In the absence of such agreement, neither party is called upon to join the other in the work of development. They are at liberty to remain as tenants in common, neither party having the right to bind the interest of the other.

"For the purpose of establishing a 'grubstake' agreement, the rule which has been adopted and followed by the courts of equity, requiring a plaintiff who seeks to establish a trust in real property contrary to the express terms of a deed which vests title in another to make out his case 'clearly and satisfactory beyond a reasonable doubt,' does not find the same reason for its application in a case where a party to a 'grubstake' agreement invokes the aid of a court of equity in establishing a trust in a mining claim located on the public domain by one of the parties to such an agreement.

"The courts will not refuse to enforce a 'grubstake' agreement simply because a complainant cannot produce that great preponderance of evidence which produces a moral certainty and precludes all reasonable doubt."

■ Nor is it necessary that such a contract state each parties' interest. The presumption is equal ownership. *Morrison's Mining Rights,* 16th Edition, page 381. The rules as to such contracts are stated in 36 Am. Jur., p. 399, as follows:

"§172. Duties, Rights, and Liabilities. — The rights, duties, and obligations of the parties to joint adventures in mining enterprises are not essentially different from what they would be were the parties engaged in any other joint venture. Unlike the situation existing in mining partnerships, the relation, one to another, of the parties to a joint adventure is fiduciary in character, and the utmost good faith is required of them in their

dealings. The member to whom the deal or property may be intrusted becomes a trustee, and, as such, will be held to account to his coadventurers. He will not be permitted to enjoy an unfair advantage or to have any greater rights in the property or profits, by reason of the fact that he is in possession as trustee, than his coadventurers. *In the absence of an express agreement, the law implies an equal division of the profits of such an adventure without regard to any inequality of contribution."* (Emphasis supplied.)

In 58 C.J.S. 709 it is stated:

"The rules governing the creation and existence of joint adventures generally, discussed in Joint Adventures §§ 2-4, apply to the creation and existence of mining joint adventures. Thus a joint mining adventure must have its origin in contract, although no particular form of expression or formality of execution is necessary, and a parol agreement is sufficient. * * * whether a particular relationship constitutes a mining joint adventure must be determined by the facts of the particular case; and whether the parties to a particular contract or arrangement have thereby created, as between themselves, the relation of joint adventurers or some other relation depends on their intention as determined from the *agreement and all the facts and circumstances."* (Emphasis supplied.)

58 Corpus Juris Secundum, page 711:

"Duration and termination. If no time is fixed by the contract for the termination of the adventure the agreement is usually construed to remain in force until the purpose of the adventure is accomplished or the enterprise is terminated in some other manner, as by abandonment. The refusal of a party to a mining adventure to perform his obligations will not entitle his associates to terminate the relation without giving him notice that the relationship is ended. * * *

"Mutual rights and liabilities of parties. The rights of the parties to a mining joint adventure or enterprise

are determined by the terms of the agreement between the parties, construed in connection with the statutes and principles of equity. However, *a party cannot withdraw from the joint adventure agreement and still avail himself of the fruits of his coadventurer's contribution.*" (Emphasis supplied.)

58 Corpus Juris Secundum, page 712:

"Fiduciary relationship. Within the scope of the enterprise, joint adventurers stand in a fiduciary relation to each other, and owe one another a duty of good faith, particularly in their dealings with the property of the joint adventure. * * * "

36 American Jurisprudence, page 336:

"A person who locates a claim in his own name, pursuant to an agreement with others under which all agree to act for the joint benefit of the parties, holds the title in trust for the others in so far as their interests are concerned." The same rule is set forth in *Morrison's Mining Rights,* Sixteenth Edition, at page 384.

█ A mining partnership with its limited powers is not founded upon *delectus personae* whereas a general partnership is. A mining partnership exists by operation of law where the several owners of a mine cooperate in the working thereof. Death or unapproved assignments do not affect it. Nor may one of the partners bind the other to third parties to the extent a general partner may do. *Charles v. Eshleman* (1879), 5 Colo. 107.

█ It is disclosed that the defendants, after locating the claims in controversy and after the filing for record of a *lis pendens* by plaintiffs, twice entered into unexercised written option agreements to sell the claims. Plaintiffs contend that on the accounting the total received for the options of $5500.00 should have been included in the gross accountable receipts. With this we agree since the *lis pendens* makes no difference between these parties. The trial court erred in holding to the contrary.

■ Here the trial court heard the conflicting testimony and found the contract. This matter was for the trial court to consider and its findings on that and other contested issues on conflicting evidence will not be disturbed on review when there is, as here, sufficient evidence to support it. *Fisk M. & M. Co. v. Reed,* 32 Colo. 506, at 515; 77 Pac. 240; *Gonzales v. Chinn,* 121 Colo. 126, 214 P. (2d) 371.

With the foregoing in mind we proceed to the determination of this case.

First, the validity of the mineral discoveries, the legal sufficiency of the locations, and the recordings thereof are not in controversy.

■ Second, the agreement in question being how to share locations actually staked (whether subsequent investigation proved the presence of commercial ore) in the area found by Tom with the use of the scintillator we find that it does not then require *"mineral discoveries"* to be first made before the contract could become effective.

Third, the court found, and the record amply sustains the findings, that there was no abandonment by plaintiffs of their rights.

■ Fourth, in their Reply Brief defendants urge the defense of laches, though it was not advanced in their Answer, citing as authority *Hunt v. Pick* (decided January 16, 1957), 240 Fed. 2d 782. That case has no application here and defendants cannot first raise the defense of laches on writ of error.

Fifth, the court found that there was a binding agreement consummated on December 26, 1954, whereby the discoverers were to have 50% and the scintillator owners 50% of the claims located in the Soapy Hill area. The trial court labeled this a prospecting agreement of the old type, a grubstake agreement whereby each side received one-half.

Sixth, the trial court having determined the terms of the agreement failed to apply it fully in its judgment.

There were five co-discoverers, each of whom were entitled to 10%. The judgment should be amended to allow Tom 10% as a co-discoverer and another 10% interest as a co-owner of the scintillator, making a total to him of 20% of the total interest in the 22 claims. Each defendant (Perkins having sold his interest to them) thus will own 13-1/3% and each of the other plaintiffs 10%. We point out that the judgment cannot be amended to assess Tom with 20% of the total expenses incurred by defendants because of their wilful failure to comply with C.R.S. '53, 92-23-1 through 9.

Seventh, as to the accounting sought in the trial court the defendants contend they should be allowed all items listed in their report and plaintiffs contend that it was error for the trial court to allow payment for the labor of Smaller, Taylor and John T. Fontecchio and to exclude the $5500.00 received on the options. The trial court did not and could not under these facts and our statutes charge these plaintiffs personally as non-working tenants for any deficit.

It was stipulated below that C. R. S. '53, 92-23-1 through 9 was not complied with. Briefly, these sections of the statutes declare that mine owners are tenants in common with each having the right to possession; that a working tenant who has given the required statutory notice is entitled to certain set offs on accounting if he has complied with the statute; for the disposition of profits; and that set off is allowed for prospecting expenses "unless it clearly and convincingly appears that said prospecting was done in bad faith with willful intent to injure or defraud the non-working tenant."

We point out that the trial court heard the conflicting evidence in this regard and though some evidence of intent to defraud the non-working tenants appears in the record we perceive no error, except as to the $5500.00 option money which was improperly excluded by the court, and will not disturb the findings as to the other items. We note in this regard that the plaintiffs, who

have affirmatively offered to do equity, knew in January, 1955, that the work was being done on the claims and in fact at least part of the bulldozing was approved by them; also that C. R. S. '53, 92-23-9 says in part: "This article shall be construed as a remedial law, intended to promote mining activity, and shall be liberally construed in favor of the working tenant."

The judgment is affirmed as to all matters except:

1. As to the interest in the 22 claims to be owned by Thomas E. Fontecchio, that part of it is remanded with direction to award him 20% interest in all of said claims.

2. As to the $5500.00 option money excluded from the accounting, that part is remanded with directions to recompute the accounting and for payment to plaintiffs of their proper share of the net profits.

MR. JUSTICE HOLLAND not participating.