## No. 17,775.

WARNER DAVID DALLAS, ET AL. *v.* J. B. FITZSIMONS, ET AL.

(323 P. [2d] 274)

Decided March 17, 1958.   Rehearing denied April 7, 1958.

Mr. LEO WILLIAM KENNEDY, Mr. FRAZER ARNOLD, Mr. FRED W. MATTSON, for plaintiffs in error.

Mr. CARL CLINE, Mr. FOSTER CLINE, Mr. WILLIAM G. SUMMERS, JR., for defendants in error.

*En Banc.*

MR. JUSTICE SUTTON delivered the opinion of the Court.

THE parties are here in the same relative position as in the trial court and will be referred to as plaintiffs and defendants or by name. The State Board of Land Commissioners, not a party hereto, will be referred to as the Board.

Plaintiffs brought an ejectment action against defendants claiming all the mining rights on a half section of state land in Park County, Colorado, under a mining lease granted to them by the Board. Defendants claim a portion of the land involved by allegedly valid prior lode mining locations under state law. Judgment was for defendants below and after the trial court dispensed with a motion for a new trial plaintiffs sued out this writ of error. As we view the record two basic questions are presented: First, was the venue of the action improperly changed from the Denver District Court, where suit was first filed, to the District Court of Park County. Second, are defendants' lode locations, asserted in their counterclaim, valid and paramount to plaintiffs' lease?

*FIRST QUESTION TO BE DETERMINED:*

*Does C.R.S. '53, 112-3-29 concerning venue for suits by the State Board of Land Commissioners, as related to this action, conflict with the Colorado Rules of Civil Procedure requiring all actions affecting property to be tried in the county in which the subject of the action or a substantial part thereof is situated?*

This question is answered in the negative. C.R.S. 53, 112-3-29 provides in part:

"Place of payment — venue. — All moneys due and payable to the state board of land commissioners shall be paid at the office of the state board * * * and all actions for the recovery of same, or for the cancellation of certificates of purchase, or for the cancellation of leases, or for the recovery of the possession of the land, actions of forcible entry and detainer, or ejectment, shall be brought in any court of competent jurisdiction in the city and county of Denver, in the state of Colorado."

Rule 98, R.C.P. Colo. provides in part:

"Place of Trial

"(a) Venue for Property, Franchises and Utilities. All actions affecting property, * * * shall be tried in the county in which the subject of the action, or a substantial part thereof, is situated." * * *

"(f) Causes of Change. The court may, on good cause shown, change the place of trial in the following cases: (1) When the county designated in the complaint is not the proper county; (2) when the convenience of witnesses and the ends of justice would be promoted by the change."

"Rule 81. Applicability in General

"(a) Special Statutory Proceedings. These rules do not govern procedure and practice in any special statutory proceeding insofar as they are inconsistent or in conflict with the procedure and practice provided by the applicable statute. * * *"

"Rule 82. Jurisdiction Unaffected

"These rules shall not be construed to extend or limit the jurisdiction of any court."

▇ If the quoted statute creates a special statutory procedure relating to this type of action then the Rules of Civil Procedure by express exception do not apply and the motion for change of venue was improperly granted by the Denver District Court. It seems clear to us that the statute does nothing more than fix the venue in actions *by the Board* in connection with its management of state lands and has no application to an action in ejectment by *a lessee* of the state against third parties. True, it expressly provides for "ejectments" but this can refer only to ejectment actions brought by the Board and obviously is for the convenience of the state to the end that its officers and employees will not have to disrupt state business and spent time attending trials away from the seat of government where the records are kept. It can have no application to lessees or third parties whose disputes are of no concern to the state. It relates only to payments to the state and the management of state lands and the methods to be used *by the Board* to enforce same. Moreover, plaintiffs are subject to the rule that a statute is to be strictly construed against him who invokes its provisions. 82 C.J.S. 530, §311. This is a reasonable construction of this statute;

it does not destroy plaintiffs' right to be heard in the proper court nor leave them without a remedy.

*THE SECOND QUESTION TO BE DETERMINED IS:*

*If mineral lode locations are made on state lands in compliance with the state laws relating to discovery, posting, notice and other applicable provisions, do such claims take priority and precedence over a subsequent mineral lease issued by the duly authorized state leasing body?*

■ This question is answered in the affirmative. The applicable Colorado Statutes read: C.R.S. '53, 112-3-41. "Mineral locations — assessment — lease. — Locations of mineral claims not exceeding three hundred feet wide and fifteen hundred feet long each, or of three ten-acre subdivisions or mineral lots may be made upon *unleased mineral lands belonging to the state.* The discoverer of a body of mineral, in either a lead, lode, ledge, deposit, vein or contact shall immediately post conspicuously a notice declaring that he has made such discovery on the date attached to the notice. The locator shall be allowed ninety days from such date in which to perform assessment work by shaft or tunnel, which assessment work shall not be at a less cost than one hundred dollars in each year, and to survey and set the corner posts of said claim and to file a certificate of location with the register of the state board of land commissioners, which certificate shall be recorded in said office, and an entry made upon the plat and tract books of such location. This procedure shall empower the locator to retain possession of and operate the claim for a period of one year, at the end of which time he shall be required to take a lease upon such terms as may be agreed upon by the state board of land commissioners." (Emphasis supplied.)

C.R.S. '53, 112-3-13 — "Leases — rental — mineral lands. — The state board of land commissioners may lease any portion of the land of the state at a rental to be determined by it, except * * *." "* * * If stone, coal,

oil, gas, or other mineral not herein mentioned be found upon the state land, such land may be leased * * *."

On April 15, 1955, there became effective an amended C.R.S. '53, 112-3-41 which altered in some respects the law applicable to future cases of this type. However, it is not material here for it cannot retroactively affect prior vested rights.

Plaintiffs state that they proved their lease was issued pursuant to the statute. They rely solely thereon for their title, and allege that defendants as claim locators are trespassers.

The record discloses that Dallas, in December 1954 or January 1955, with one Vernon Chandler went to Fitzsimmons' ranch. Chandler asked for and was granted permission to prospect for uranium on Fitzsimmons' deeded land. The record does not disclose any discovery or claim locations by either Dallas or Chandler as a result thereof.

On February 27, 1955, Fitzsimmons with his six co-defendants, while prospecting in the area with a geiger counter, found a count of "four to five times" the background count. They at first believed the discovery to be on federal lands possibly joined with some state land and some of Fitzsimmons' deeded lands. On that same day they prepared location notices and proceeded to post them on the original three claims involved here. The uncontradicted testimony of Fitzsimmons was that he had made a note that he believed they had 60 days from their discovery date in which to file their notices and through some error that date was first placed on the notices, but when the mistake was discovered that same day, it was forthwith corrected to the day of discovery and actual posting; i.e., February 27, 1955.

The original discovery pits were dug by defendants where the original location notices were posted and the original discoveries made, even though geiger counter readings were gotten elsewhere on the claims. Fitzsimmons on direct examination testified with reference

to the discovery by geiger counter and then: "Q. And after discovery was made what next was done? A. We proceeded to prospect some ore and then get our notices and get them up."

On April 2, 1955, Dallas and some friends visited Fitzsimmons' ranch and the next day, which was a Sunday, they were shown the located claims. By this time it was realized that the claims were on state land. Dallas was told this and that the area was already taken and posted. Fitzsimmons testified that at that time Dallas wanted to lease the claims from the discoverers but was refused. Effective at noon on April 4, 1955, Dallas secured mining lease No. 778, Book 16, from the Board to the East half of Section 27, Township 7 South, Range 73 West of the 6th P.M., Park County, Colorado, which area includes the claims here in question, and on the same date beginning at 4:55 P.M. defendants recorded their location certificates in Park County. In the "middle of April" Fitzsimmons received a letter from the Board advising that defendants were trespassers on the land covered by their recorded claims.

It appears that defendants first posted location notices on their then three claims in accordance with the federal law providing for lode claims 1500 feet in length and 600 feet in width being 300 feet on each side of the discovery lode; that defendants later made up amended location certificates dividing these into four claims known as Redskin Mining Claims No. 1-A, No. 1-B, No. 2-A and No. 2-B; and on May 25, 1955, attempted to file these four separate location certificates with the Board in order to comply with the state law. The Board refused to accept the filings and Fitzsimmons then left them on the registrar's desk at the Board's office.

Assessment work, as required by the statute, was done on the various claims in April and May, 1955. There is evidence that uranium was found on each claim by use of the geiger counter. Assays of the claim samples from one of the discovery pits showed chemical results of up

to 1.24% uranium and 0.4% vanadium according to testimony objected to but not ruled on below.

Much of the material evidence was disputed; however there is adequate support in the record for the findings in defendants' favor by the trial court. Whether a vein or lode has been discovered or exists within the limits of the location in controversy, and as to the continuity of ore and mineral matter constituting the length, width and extent of any particular vein or lode, is always a question of fact to be determined by a jury, or by the court if the case is tried without a jury. *Book v. Justice Min. Co.,* 58 Fed. 106 (Nev. 1893). We need not again cite Colorado cases stating the rule that findings and conclusions of the trial court, when supported by competent evidence, will not be disturbed on review.

We are constrained to comment on one phase of the fact situation in this case; viz., the methods of determining proper discovery of radioactive minerals as occurred here.

The record and briefs carefully and ably detail the lengthy history of just how defendants made their discoveries with a geiger counter and later had samples from one of the claims chemically assayed. The assays proved what the geiger counter indicated on the ground; i.e., mineralization sufficient to constitute a "discovery" within the meaning of our statute. Mineral in the statutory discovery sense means valuable rock in place subject to definable boundaries. The discoveries here fall within this definition. See *Nev. Sierra Oil Co. v. Home Oil Co.,* 98 Fed. 673 (1899 Calif.). The assayed samples were not mere indications of mineral, radiometrically or by float; they established mineralization. Mineral location statutes should be liberally construed in behalf of bona fide locators with due regard for a fair application of the statutory requirements. As is said in *Nev. Sierra Oil Co. v. Home Oil Co.,* supra, at page 676:

"Indications of the existence of a thing is not the thing itself. It is entirely true that the statute, requiring as a

condition to a valid location the discovery of mineral within the limits of the claim, should, as between conflicting claimants to mineral lands, receive a broad and liberal construction, and so as to protect bonda fide locators who have really made a discovery of mineral, whether it be under the statute providing for the location of vein or lode claims or placer claims. As was well said by Judge Hawley in Book v. Mining Co. (C.C.) 58 Fed. 106, 120, in speaking of vein and lode claims:

" 'When the locator finds rock in place containing mineral, he has made a discovery, within the meaning of the statute, whether the rock or earth is rich or poor, whether it assays high or low. It is the finding of the mineral in the rock in place, as distinguished from float rock, that constitutes the discovery, and warrants the prospector in making a location of a mining claim.' "

Where as here the assay samples come from at least one of the claims, and all the claims are contiguous, and where the trial court could and did conclude from the evidence that the non-assayed claims lie in similar ground, it is not unrealistic to hold that competent radiometric reactions supported by a chemical assay as to a part of the claims, clearly show the presence of uranium on the adjacent claimed locations, showing the same or similar radiometric readings. The latter are then valid "discoveries" under our statute as much so as are outcrops visible to the naked eye. Such other "discoveries" however must be capable of competent radiometric delineation in similar rock in place or along the same vein or lode. See *Smaller v. Leach*, 136 Colo. 297, 316 P. (2d) 1030, for a discussion of radiometric discoveries; and compare *Rummell v. Bailey* (1958) 7 Utah, 2nd 137, 320, P. (2d) 653, and *Globe Mining Company v. Anderson* (1957 Wyo.), 318 P. (2d) 373.

Keeping in mind that technical prospecting methods, such as the use of counters and scintillators, are only exploration tools and not complete exploration and discovery systems, we hold that here the radiometric

results coupled with the other evidence, such as the assay and type of rock in place show an overall fair compliance with the statute requiring discovery.

■ We also hold that the leasing powers of the Board under C.R.S. '53, 112-3-13, are subject to the implied limitation that it cannot lease state land already properly in the physical possession of others under the mining laws. Defendants' claims, under the facts presented, have priority and must be accepted by the Board which must then in due course permit mineral leasing of the same under C.R.S. '53, 112-3-41. This is not to say, however, that plaintiffs' lease is invalid as to lands not included within the limits of defendants' claims. We are not called upon to, nor do we, rule on that point.

The judgment is affirmed.

MR. JUSTICE HALL dissenting.

MR. JUSTICE FRANTZ not participating.

MR. JUSTICE HALL dissenting:

I respectfully dissent from the majority opinion.

According to the record, defendants, on February 27, 1955, went upon the E ½ of Section 27, property owned by the state of Colorado, armed with a geiger counter, and according to the testimony "We did find a reading that was above what was considered to be commercial uranium on these lands that I have described to you; and we did post notices at points where we got a geiger counter reading."

Three claims each 1500' x 600' were staked and discovery notices posted. The claims were called Redskin No. 1; Redskin No. 2, and Redskin No. 3. Redskin No. 3 is all located on Federal lands and is not involved in this case. Location certificates recorded in the office of the County Clerk of Park County on April 4, 1955 (by coincidence the same date as plaintiffs' lease) describe Redskin No. 1 as: Beginning NE corner Sec. 27, thence W 1500', thence S 600', thence E 1500', thence N 600' to

the place of beginning. Redskin No. 2 is described as: Beginning at a point 1500′ W of the NE corner of Sec. 27, thence W 1500′, thence S 600′, thence E 1500′, thence N 600′ to the point of beginning. Each certificate states that the claim extends 750′ east and 750′ west of the "center of discovery shaft."

"We did the work as we originally staked it *prior to April 4, 1955,* that is, on these *two claims.* We *dug* two holes, we set the outside stakes on the ---- prior to April 4th. It was subdivided later."

\* \* \*

. "We had an assay made \* \* \* it showed 1.24 in uranium, and I believe it was 0.4 in vanadium \* \* \* it was taken from *one* of these discovery holes \* \* \* from *one* of the discovery pits \* \* \* on these claims, that is correct."

There is some evidence that geiger readings were gotten at four points, four holes dug, and four notices posted — *when* is anyone's guess, but presumably not until after April 4, 1955, the date of plaintiffs' lease, the date defendants recorded with the County Clerk of Park County notices of *two* claims, *two* discoveries, Redskin No. 1 and Redskin No. 2. The first evidence of Redskins 1-A, 1-B, 2-A, and 2-B, the claims in litigation, is May 25, 1955, more than six weeks after plaintiffs had been granted a lease by the State.

Evidence showing mineral *in place* is wholly lacking unless geiger counter readings are evidence of such fact.

I find nothing in the record to indicate that any mineral was found in place. Certainly the geiger counter does not indicate mineral in place; readings could be the same for mineralized rock *in place* or *in float* or *in wash.* As to the rock allegedly sent for assay, the evidence only shows that it *came from one of the claims.*

I feel that some of the language in the majority opinion is revolutionary insofar as mining laws and mining decisions are concerned. By way of illustration I point to the following:

"The record * * * details the lengthy history of just how defendants made their discoveries with a geiger counter * * *."

Does that mean a discovery as contemplated by C.R.S. '53, 112-3-41, may be made with a geiger counter? The statute provides that discovery must be made "* * * of mineral, in either a lead, lode, ledge, deposit, vein or contact * * *."

I respectfully submit that a geiger counter, no matter what its reading may be, does not prove mineral in place. Without discovery of *mineralized rock in place* there can be no valid location of a lode claim, no matter what the geiger readings may be.

The effect of the majority opinion is to substitute for *proof of a discovery of mineral in place* a mere possibility, probability or conjecture of mineral in place, and thus judicially legislate that there need not be an actual and proven discovery to have a valid claim.

The legal effect of the decision is to authorize unlimited filings based on one actual valid legal discovery. If such a result is desirable, then that is a matter for the legislature and not for the courts.