J. B. TEMPLETON V. M. H. WOLVERTON ET AL.

No. A-18. Decided March 15, 1944.
Rehearing overruled April 12, 1944.
(179 S. W. 2d Series, 252.)

*Malone, Lipscomb, White & Seay*, of Dallas, for petitioner.

It was error for the Court of Civil Appeals to hold that petitioner (Templeton) was a partner with the respondents, Moore and Thomas, and was bound by the contract of June 4, 1940, and the subsequent oral agreements between Wolverton and Moore and Thomas. It was error on the part of the Court of Civil Appeals to sustain respondent's Wolverton's assignment of error that it was error for the trial court not to render a joint and several judgment for the entire amount of $19,331.00 against Moore, Thomas and Templeton, and in reforming that judgment. Root v. Tomberlin, 36 S. W. (2d) 596; Shell Pet. Co. v. Caudle, 63 Fed. (2d) 296; Cox v. Bond, 91 S. W. (2d) 479; Roberts v. McKinney, 187 S. W. 976.

*Stinson, Hair, Brooks & Duke*, of Abilene, for respondent.

In reply to above propositions: Bolding v. Camp, 6 S. W. (2d) 94; Glenn v. Steele, 141 Texas 565, 61 S. W. (2d) 810; Seifert v. Brown, 53 S. W. (2d) 117; Munsey v. Mills & Garrity, 115 Texas 469, 283 S. W. 754.

MR. JUDGE SMEDLEY, of the Commission of Appeals, delivered the opinion for the Court.

Respondent Wolverton sued petitioner Templeton, Leon Thomas and M. B. Moore to recover $19,331.00 for his services in drilling an oil well in Kimble County, alleging that on March 23, 1940, Templeton, Thomas and Moore entered into a written contract of partnership for the purpose of developing land for oil and gas, that thereafter Thomas and Moore, acting for themselves and as agents of Templeton, employed respondent Wolverton by contract partly written and partly oral to drill a well, and that he drilled the well and has never been paid the agreed compensation.

The trial court rendered judgment for respondents against Thomas and Moore for the full amount, $19,331.00, and judgment against Templeton for $1,000.00, having concluded that the only claim respondents had against Templeton was under the contract of March 23, 1940, by the terms of which Templeton limited his liability to $3,000.00. He had advanced $2,000.00 to Thomas and Moore. Neither Thomas nor Moore appealed. The Court of Civil Appeals, to which both Wolverton and Templeton appealed, corrected the trial court's judgment "so as to run against Thomas, Moore and J. B. Templeton jointly and severally for the sum of $19,331.00" and affirmed the judgment as thus corrected. 176 S. W. (2d) 335.

The principal contentions made by petitioner Templeton are, first, that the instrument of date March 23, 1940, and his connection with operations thereunder were insufficient to constitute him a mining partner of Thomas and Moore and, second, that even if by that instrument and in the operations thereunder Templeton became a mining partner of Thomas and Moore in the well then in process of being drilled, Thomas and Moore were not authorized to bind him by the written contract of June 4, 1940, and subsequent oral agreements with respondent Wolverton, whereby an entirely new venture was entered into and another well was drilled.

When the contract of March 23, 1940, was made Thomas, a resident of Ballinger, and Moore, a resident of Abilene, had

drilled a well by day labor to a depth of 492 feet. The well was begun for the purpose of making a test of what was known as the Adams Branch sand, which they hoped to reach at about 800 feet. Being in need of financial assistance, Thomas and Moore went to Dallas for the purpose of procuring funds from petitioner Templeton. The agreement there made was evidenced by an instrument in the form of a letter dated March 23, 1940, from Thomas and Moore to Templeton and signed by the three parties. The first paragraph of the letter contains a list of oil and gas leases owned by Thomas and Moore on lands in Kimble County aggregating 4,234 acres. This is followed by statements about other wells drilled in the vicinity by other persons and companies, the structures, the sand, etc. The instrument states that the well they are drilling is stopped at 492 feet, that they have a standard rig and necessary tools, and have all payrolls and bills taken care of except certain bills amounting to less than $200.00. The last paragraph of the instrument is as follows:

"Your proposition was to advance us $750.00, we to give you two notes in amount of $250.00 each aggrigating $500.00, to take care of the expense in getting the pipe to the location and test the Adams Branch Sand. In the event this proves successful we will then want to drill several shallow wells. If it doesn't, our plan is to go to the next pay sand; or to our contract depth of 2,000' if we all agree it is adviseable. For the added expense we will give you additional notes at the same ratio not to exceed $3000.00 total cost. We do hereby agree that any and all returns from the sale or operations of any and all interests we have in the above described acerage money advanced by you on this project. After this obligation is satisfied all futhur returns we agree to give you a one third interest. It is futhur agreed that we will give to you a legal conveyance of title to a one third interest in all of the above described properties and rights at any time you may request. In addition to the above we will want a letter from you stating you are going to see us through, not to augment this trade but for the influence it will have on a prospective purchaser. We know most of the major companies are interested in this area and some assurance we are going to fulfill our contract will have lots of weight, we fully believe we can drill the well on the bottom hole money we get from the companies, or large independent operators. The operations will be carried on in the name of Thomas & Moore, insofar as the name you will not be known in the deal, but we shall expect your council throughout the entire operations, two thirds of the holdings will be in M. B. Moore's name and one third in Leon Thomas'."

At the time of the execution of the foregoing instrument, Templeton advanced $750.00 to Moore and Thomas, taking the note of each of them for $250.00. On April 24, 1940, when the original well was being drilled, Thomas and Moore borrowed a second $750.00 from Templeton, and each of them, as before, gave Templeton his note for $250.00. They borrowed another $500.00 from Templeton and evidenced it by their joint note to him in that amount dated July 3, 1940. Thomas testified that this money was borrowed under the same conditions as those under which the $750.00 was borrowed in March and another $750.00 in April, 1940.

Thomas and Moore proceeded with the drilling of the well to a depth of 750 feet, when, on about May 1, 1940, a crooked hole was developed and drilling ceased. Wolverton, at the request of Thomas and Moore, worked on the original well a few days and found he could not straighten it, and after he had determined that he could no nothing with the original well, he entered into a written contract on June 4, 1940, with Moore and Thomas to drill another well. This contract is between Moore and Thomas as first parties and Wolverton as second party. By it the second party agreed to drill a well to a depth of 2,000 feet for $3.50 a foot, all tools and equipment to be furnished by him except pipe, which should be supplied by Thomas by Moore. Under the contract Wolverton drilled the new well to the agreed depth of 2,000 feet without producing oil. Thereafter, by oral contract with Moore, he agreed to continue to drill for $100.00 a day of twenty-four hours and worked under that contract for thirteen days. Then by another oral contract with Moore, he agreed to drill for $90.00 a day of sixteen hours, and drilled for 117 days under that contract. Drilling ceased in March, 1941, at about 3102 feet, without production. No payment was made to Wolverton for his services.

The trial court made elaborate findings, the greater part of which consists of a statement of the contents of the contract of March 23, 1940, and of the facts above set out. The court found that Templeton's signature was not on the contract of June 4, 1940, and that he was not a party to the subsequent oral contracts. In detailing the facts as to respondent Wolverton's employment under the contract of June 4, 1940, to drill a new well, the findings state that Thomas and Moore, "for themselves and in behalf of Templeton," employed Wolverton. We cannot construe this statement to mean that Thomas and Moore were authorized to act for Templeton in employing Wolverton, for the trial court found that the only claim Wolverton has against

Templeton in this case is by virtue of the contract of March 23, 1940, and limited Templeton's liability to what he had agreed under that contract to advance. If the statement is intended as a finding that Moore and Thomas were authorized to act for Templeton in contracting for the drilling of a second well, it is not supported by evidence. The trial court found further that by virtue of the contract of March 23, 1940, and drilling operations thereunder there was joint ownership of the oil and gas leases by Thomas, Moore and Templeton, joint operation of the leases by them, community of interests, mutual agency and sharing of profits, all of the several elements of a mining partnership.

The Court of Civil Appeals approved and gave effect to the findings of the trial court that Templeton was a member of a mining partnership and concluded also that the contract of June 4, 1940, by which respondent Wolverton was employed to drill the second well, was in furtherance of the contract of March 23, 1940, and that Templeton became liable for the work done by Wolverton under the written contract of June 4, 1940, and under subsequent oral contracts. 176 S. W. 2l) 335.

It is our opinion, after carefully reading all of the evidence, that the findings and conclusions of the trial court and of the Court of Civil Appeals that a mining partnership, to which Templeton was a party, was created and the conclusion of the Court of Civil Appeals that Templeton became liable for work done by Wolverton under the contract of June 4, 1940, and subsequent oral contracts are wholly without support in evidence.

■ A mining partnership may of course be created by express contract and it may be created, without express contract, by joint ownership and joint operation of mineral interests. Munsey v. Mills & Garrity, 115 Texas 469, 483-484, 282 S. W. 754; Boling v. Camp (Com. App.) 6 S. W. (2d) 94, 95; Summers' The Law of Oil and Gas, Vol. 4, pp. 144-145, Sec. 721; 12 Texas Law Review, pp. 410, 413-414.

■ There is nothing in the contract of March 23, 1940, indicating an intention to form a mining partnership. It is, both in its language and in substance, an agreement for the advancement or loan of money from Templeton to Thomas and Moore, to be used by them to defray the expenses of getting pipe to the location of the well then being drilled and of testing the Adams Branch sand, to which the well was intended to be drilled, and for the advancement or loan by Templeton to Thomas and

Moore of additional sums, not to exceed in all $3,000.00, to be used to pay the added expense of drilling several shallow wells if the test of the Adams Branch sand proves successful; or if that test does not prove successful, to be used to pay the added expense of drilling the first well to a depth of 2,000 feet, provided all agree that it is advisable. The contract provides that all returns from the sale or operation of any and all interests that Thomas and Moore have in the described acreage shall be applied first in payment to Templeton for all money advanced by him on the project, and that after this obligation is satisfied Thomas and Moore agreed to give Templeton a one-third interest in all further returns. They further agree to give Templeton "a legal conveyance of title" to a one-third interest in all of the property whenever he may request it.

It may be assumed, without deciding it, that the foregoing provisions were sufficient to invest Templeton with ownership of an undivided interest in the leasehold estate. But joint ownership without joint operation by the cotenants does not effectuate a mining partnership. Rucks v. Burch, 138 Texas 79, 156 S. W. (2d) 975; Wagner Supply Co. v. Bateman, 118 Texas 498, 505, 18 S. W. (2d) 1052; Gardner v. Wesner, 55 S. W. (2d) 1104 (application for writ of error refused); Wesner v. Brendel, 94 S. W. (2d) 239; 4 Summers' The Law of Oil and Gas, pp. 150-154, Sec. 723; 12 Texas Law Review, pp. 410, 418-423.

There is nothing in the contract of March 23, 1940, even suggesting that Templeton will participate in the actual development or operation of the property. The contract recites that the well is then being drilled by Thomas and Moore and contemplates that they shall continue to drill it. Templeton is obligated to do nothing but advance funds, for which he is to receive payment from the first returns from the property, and give counsel to Thomas and Moore. One who advances money, tools or equipment to enable the owner to work a mine, relying upon profits from the mine to repay his advances, does not thereby, and without actual participation, or agreement to participate, in the operation of the property, become a mining partner. Gerdner v. Wesner, 55 S. W. (2d) 1104, (application for writ of error refused); Seifert v. Brown, 53 S. W. (2d) 117 (application for writ of error refused); Leath v. Benton Abstract & Title Co., 9 S. W. (2d) 501. This is true even though the person making the advancement has become, or is to become by reason of the advancement and after it has been repaid, the owner of an undivided interest in the property. Bolding v. Camp, (Com. App.) 6 S. W. (2d) 94; Leath v. Benton Abstract & Title Co., supra;

Gardner v. Wesner, supra; Seifert v. Brown, supra. Templeton's agreement to counsel Thomas and Moore denotes neither the existence of a partnership relation nor an intention to enter into that relation. Wesner v. Brendel, 94 S. W. (2d) 239, 240; Bolding v. Camp, (Com. App.) 6 S. W. (2d) 94.

As far as petitioner Templeton is concerned, the record contains no evidence whatever to connect the contract made between Moore and Thomas and Wolverton on June 4, 1940, by which Wolverton was employed to drill the second well, with the contract of March 23, 1940. The contract first made and to which Templeton was a party related to the first well and had for its primary purpose the procuring of funds from Templeton to complete the drilling of that well to the Adams Branch sand. Advancements were to be made for the drilling of other shallow wells only if the first well proved a success. It was not a success. The provision about drilling to a depth of 2,000 feet relates to the well then being drilled and not to a new well. It clearly means that the first well may be drilled to that total depth, if it does not prove successful at the shallow Adams Branch sand; and it is expressly stated that the well shall not be drilled to that depth unless all agree that it is advisable.

The contract of June 4, 1940, was for the drilling of a new well, not for the drilling of the first well to a greater depth, and under it a new well was begun and drilled by Wolverton. The contention that Wolverton was employed to drill the second well "in keeping with Templeton's request," or advice, that they get a competent man to drill on the land, cannot be sustained. The testimony relied upon to support the contention, that of Thomas, is that he and Moore went to Dallas in May, 1940, and told Templeton that the first well had proved to be a crooked hole, and that Templeton advised them "to get a competent driller to take it over and see if they couldn't complete that well," meaning of course to complete the first well, not to begin a new well. The contract of June 4, 1940, makes no reference to the first contract. Templeton was not a party to the second contract and was not mentioned in it. The undisputed evidence shows that he was not present when the contract was made and was not consulted about it. The same is true of the two oral contracts later made with Wolverton by Thomas and Moore, or by Moore. Templeton was not a party to them. No one testified that Templeton's name was mentioned when the two oral contracts were made or that anyone undertook to bind him in their making. According to the undisputed evidence he was not consulted about them and was not present when they were made. All of Wolverton's work on account of which he sues in this case was

done under the written contract of June 4, 1940, and the two oral contracts thereafter made.

There is no allegation and no proof of any holding out of Templeton as a partner and no evidence of the advancement of credit by Wolverton on account of any representation or belief that Templeton was a partner or would be for any reason liable to him.

There remains to be considered the question whether there is any evidence tending to prove that Templeton actually joined with Thomas and Moore in developing or operating the property, that is, in drilling the wells or either of them, and thus became, without express agreement, a mining partner. Respondent Wolverton relied primarily, if not wholly, on the testimony of Thomas to prove participation by Templeton in the drilling operations. Thomas, although a defendant, adopted in his answer the allegation of the plaintiff Wolverton that Thomas, Moore and Templeton were partners in drilling the wells. He alleged further that in September, 1940, Moore and Templeton agreed with him that, in consideration of his assigning all his interest in the oil and gas leases to Moore, Templeton and Moore would assume all of the debts of the partnership and he prayed that he have judgment against Templeton and Moore for whatever amounts the plaintiff might recover against him. Thomas testified on the trial that this agreement was made. Moore and Templeton testified that it was made. The trial court found that the agreement was not made and rendered judgment that Thomas take nothing by his cross action against Templeton and Moore.

Respondent Wolverton testified fully as to his employment by Moore and Thomas and his work done under that employment. His testimony contains nothing to indicate that Templeton was a party to any of the agreements made with him. The whole of his testimony with reference to Templeton is that he saw Templeton at the well only one time, which was in November, 1940, that this was the first time he had even seen Templeton; that he had "not very much conversation" with Templeton at that time; and that Thomas had told him about Templeton long before that.

The substance of the testimony of Moore and Templeton about Templeton's participation in the drilling operations is that Templeton had no part in the drilling of the first well except to make the advancements that he had agreed to make; that he was not a party to any of the contracts with Wolverton, was not

consulted about them and neither exercised nor undertook to exercise any control over the drilling of the second well.

Thomas' testimony relating to this subject, viewing it most favorably to respondent Wolverton, is: that when a crooked hole was developed in the first well, Templeton advised him and Moore to get a competent driller "to take it over and see if he couldn't complete that well"; that in September, 1940, after the well had reached a depth of 2,000 feet, Templeton advised them Thomas and Moore, to quit the project; that sometime in August, 1940, when they were having difficulty in procuring pipe for the well he and Moore had a conversation with Templeton and that Templeton telephoned the Bethlehem Steel Corporation about getting pipe and later the pipe was shipped to Menard, Texas, and used in the well; that in a conversation in Dallas in August, 1940, when they were discussing getting the pipe, Templeton and Moore agreed with him that if he would relinquish his interest "they would go ahead and drill the well" and assume all debts; and that he and Moore told Templeton they had made a contract with Wolverton and that he was drilling the well.

Thomas' testimony is often contradictory in itself. As to obtaining pipe for the well, he finally testified that it was obtained from Bethlehem Steel Corporation through Service Equipment Company; that he did not know whether the pipe was bought or rented and did not know to whom it was charged, or who paid for it or whether payment was ever made. Both Moore and Templeton testified that the pipe for the well was leased by Thomas and Moore from the Service Equipment Company, of which Templeton was an executive officer. As has been shown, Moore and Templeton testified that they did not agree with Thomas that if he would relinquish his interest they would go ahead with the well and assume the indebtedness. The trial court resolved this contradiction in favor of the testimony of Moore and Templeton.

The substance of Thomas' testimony, therefore, is that on two occasions Templeton gave him and Moore advice about the wells, that Templeton talked with them about obtaining pipe for the second well, and that Templeton was told that they had employed Wolverton to drill the well and that he was drilling it. These facts, and the fact that Templeton was at the well one time when it was being drilled, are evidence of Templeton's interests in the results of the drilling operations. They do not tend to prove that he was acting with Thomas and Moore in directing

or controlling the drilling of the well or wells. Bolding v. Camp, (Com. App.) 6 S. W. (2d) 94; Wesner v. Brendel, 94 S. W. (2d) 239.

The case has been fully developed and the judgment will be rendered that the trial court should have rendered. The judgment of the Court of Civil Appeals is reversed. The judgment of the district court in favor of respondent Wolverton against petitioner Templeton is reversed and judgment is here rendered that respondent Wolverton take nothing by his suit against petitioner Templeton. The judgment of the district court is reformed so as to adjudge that respondent Wolverton have and recover judgment against Leon Thomas and M. B. Moore jointly and serverally for the total sum of $19,331.00, with interest thereon at 6% from January 1, 1942, and all costs of court. In all other respects the judgment of the district court is affirmed.

Opinion adopted by the Supreme Court March 15, 1944.

Rehearing overruled April 12, 1944.