The Bovaird Supply Company, Plaintiff-Appellant, v. Robert McClement, Defendant-Appellee, and Omar W. Minton, Jr., Defendant.

Gen. No. 61–M–11.

Fourth District.

October 5, 1961.

Craig & Craig, of Mt. Vernon (Glenn E. Moore, of counsel), for appellant.

C. M. Raemer, of Salem, for appellee.

HOFFMAN, PRESIDING JUSTICE.

Plaintiff corporation appeals from a judgment in the amount of $80.31 entered by the trial court in its favor against the defendant Robert McClement. Plaintiff had sued defendant Robert McClement along with another defendant, Omar W. Minton, Jr., for the purchase price of oil field equipment and supplies which plaintiff had sold on credit. The case was heard by the court without a jury, and a judgment was entered for the plaintiff against the other defendant, Omar W. Minton, Jr., in the amount of $7,095.34, but the judgment entered against the defendant Robert McClement was in the sum of $80.31 only. It was the failure of the trial court to enter judgment against the defendant Robert McClement in the sum of $7,095.34 which caused the plaintiff to bring this appeal. The entire issues on appeal require an extensive

review of the evidence presented to the trial court and this we have done.

Plaintiff, having its principal office in Tulsa, Oklahoma, was in the business of selling oil field equipment and supplies through several outlets in Illinois, one of which was a store in Salem. Defendant Robert McClement was the operator of a super market but had "dabbled" in the oil business for a period of 10 years. One Omar Minton, Sr. was in the wholesale meat and produce business and was a customer of the defendant Robert McClement at his super market store. Defendant Omar W. Minton, Jr., was by trade a coal miner. Plaintiff claims that these men were partners throughout the entire period it sold the merchandise including the merchandise being sued for by it in this suit.

The transactions concerning the parties involved three oil and gas leases, all of which were worked in the year 1955. The first lease was known as the Palek lease, and operations thereunder were started in February, 1955. About 2 months later, operations were started under the second lease, known as the Ziba, or Zemba, lease, and operations under that lease were completed in June of 1955. These two leases covered farms in Washington County. Operations under the third lease, the one which is of main concern in this litigation, were started in October of 1955, 2 or 3 months after completion of operations under the prior lease. This last lease is referred to as the Belle Dial lease and covered a farm in Hamilton County. While plaintiff sold and delivered merchandise and supplies under all three leases, it was stipulated by the parties at the trial, and the evidence showed, that the suit was brought for the equipment and supplies sold for operations under the Belle Dial lease, with the exception of several small items amounting to $65.56 sold under the Palek lease.

227

All three of the leases were originally procured by Omar Minton, Sr. but, because of judgments against him, he took the leases in the name of his son, Omar W. Minton, Jr. Fractional interests in the various leases were sold by Omar Minton, Sr. to raise money for the drilling of the wells, and assignments were made by the son to the parties purchasing the various interests so sold.

In February of 1955, the defendant Robert McClement, together with Omar Minton, Sr., went to the plaintiff's store at Salem, Illinois and there they talked with a F. H. Rudrauff, plaintiff's district manager. This was the first time there were any negotiations for the equipment sold by the plaintiff. Both parties gave a credit reference to Rudrauff; the defendant McClement giving as his credit reference his bank at West Frankfort. The Salem store received approval from the home office for credit on equipment to be sold. Thereafter, equipment was ordered, mostly by one Jean Tober, the operator. At the time of the original conversations in plaintiff's store, the only well being developed was the well on the Palek lease. At the request of McClement and Minton, Sr., the account at the store was set up in the name of Omar W. Minton, Jr. and thereafter the account continued under that name and style. From February, 1955 on, the plaintiff, through its Salem store, sold a large amount of oil equipment for the Palek well. Most of it was sold in February though some items were sold as late as July and one or two items even after that date. This merchandise was fully paid for with the exception of 2 or 3 minor items as noted before. The equipment for the Ziba well (second lease) was sold commencing in April and running into June of 1955. The equipment on the Ziba lease was duly paid for by Omar Minton, Sr.

228

Plaintiff contends that the trial court's judgment in its favor against defendant Robert McClement in the amount of only $80.31 is against the manifest weight of the evidence. The theory is based on three contentions:

1. That defendant Robert McClement is liable as a business partner of Omar Minton, Sr.

2. That he is liable as a mining partner of Omar Minton, Sr.

3. That he is liable under the doctrine of estoppel.

The plaintiff prays that, since there was no jury trial and there was no dispute as to the amount due, this court should reverse the trial court without remanding and that we should enter judgment in its favor against the defendant Robert McClement in the amount of $7,095.34; the same as was entered against Omar W. Minton, Jr. by the trial court.

The equipment on the Belle Dial lease was sold over a period of time commencing on September 29, 1955 and running through December of that year. After the account became delinquent, a note was executed on November 23, 1956 in the sum of $5,375.25, payable to the plaintiff. The note was executed by Omar Minton, Sr., but he signed his son's name. The original complaint filed in July of 1958 was a suit on that note and was filed by plaintiff against Omar W. Minton, Jr. only. The father, Omar Minton, Sr., died in September of 1957 and plaintiff filed a claim, dated October 22, 1957, against his estate for the sum of $5,375.25, based on the promissory note of November 23, 1956. In October of 1958, plaintiff, by leave of court, filed an amendment to the complaint, adding Count II, in which a judgment was sought against Robert McClement as well as against Omar W. Minton, Jr. for the merchandise sold by plaintiff.

In the Palek lease, the defendant Robert McClement had a 59/512 interest. Omar Minton, Sr. had a slight-

229

ly larger interest. Omar W. Minton, Jr. had a 1/64. In the Ziba lease, defendant Robert McClement and Omar Minton, Sr. each had a 11/128 interest. Again, Minton, Jr. had a 1/64. In the Belle Dial lease, defendant Robert McClement and Omar Minton, Sr. each had a 45/512 and Minton, Jr. had a 1/64. The Belle Dial lease assignment to defendant Robert McClement was executed on November 23, 1955.

Plaintiff argues that there existed a business partnership between McClement, Minton, Sr. and Minton, Jr.; that they "pooled their talents to get oil production for themselves"; that they "joined together to carry on a venture for their common benefit, each contributing services and having a community of interest in the profits." Plaintiff says that defendant McClement gave names to Minton, Sr. for prospective purchasers of fractional interests to raise money to drill the wells; that Minton, Jr. made the assignments; that they were on the locations at various times during the drilling; that McClement used his experience in directing the completion of the well; that Minton, Jr. handled the money; that Minton, Sr. looked after the operation of the wells; that all received oil runs from the pipeline company; that none paid a pro rata share of the equipment although other fractional interest holders did and that none of the salvage was paid to these three men on abandonment of the wells.

Plaintiff further argues that, at least, there is a mining partnership because of the *joint ownership* and *joint operation* of mineral interests. Plaintiff says McClement helped get the "et als"; put up his credit; negotiated drilling contracts; and used his experience in completing the well. Plaintiff further contends that defendant McClement should be held liable under the doctrine of estoppel, in that he permitted plaintiff to presume that Minton, Sr. was defendant's agent.

230

Defendant denies there was any partnership, and though he admits that he was liable on the Palek lease equipment, he claims that that transaction was a separate account, and that the plaintiff had no right to treat the matter as a running account. Defendant points out that the equipment on the second well, the Ziba well, was paid for by Minton, Sr. and that at the time of the assignment to him of his fractional interest in the Belle Dial lease in November of 1955 at least 90% of the equipment had already been sold and delivered. Defendant states, "The drilling and equipping of each oil and gas lease is a separate venture and rests on its own bottom." This, he contends is the standard and accepted oil field practice.

Omar Minton, Sr. owed defendant McClement a grocery bill of approximately $800, and McClement contends that the assignment to him of the interests in the leases was to continue until the bill was paid off, at which time he was to assign the lease interest back to Minton, Sr.; that at the time of the Palek lease he had no knowledge that Minton, Sr. would ever drill any other well; that the Palek and Ziba leases did not pay enough to retire the grocery bill; that there was no contact made to him by plaintiff to determine whether McClement had an interest in the Belle Dial lease nor whether he would stand good for the debts; that plaintiff never contacted him at all until after the equipment had been sold for salvage, and that the first time he was contacted on plaintiff's bill was in September of 1957 after Minton, Sr. had died.

F. H. Rudrauff, sales representative for plaintiff, testified to the February, 1955 conversation with defendant McClement and Minton, Sr. in the Salem store of plaintiff. He testified that he asked these gentlemen if they were partners, and they said they were; that they wanted to set up a credit account in the name of Minton, Jr. as they had a well in Washington

231

County known as the Palek well, and they wanted to buy equipment for it. He took the credit references, and they checked out. He stated that the next contact he had with McClement was in the summer or fall of 1956 when he called to see about the account in Minton, Jr.'s name, which account was then delinquent. He further stated that he had a conversation with Minton, Sr. on the Belle Dial lease and was told by Minton, Sr. that the three men were operating the same as before. On cross-examination, he couldn't identify which party said that there was a partnership nor could he state that at the time of the delivery of the equipment to the Belle Dial lease that he knew defendant McClement owned an interest in it. He stated that it was after November of 1956 when he first mentioned to defendant McClement that they were looking to him for payment of the account.

Burlin Price, store manager of plaintiff, testified that he talked with McClement on the Ziba lease in April of 1955 and asked about the prospects of selling the equipment and was told that they would do business with his store. He later talked to Minton, Sr. on the Belle Dial lease while they were drilling on the Ziba lease, and that he was told by Minton, Sr. that they would do business with him if they made a well and needed equipment. He never contacted McClement prior to delivery of any equipment on the Belle Dial lease. He stated that at no time did McClement say he was a partner with the Mintons in the oil business nor did he know at the time the equipment was delivered on the Belle Dial lease whether or not McClement had any interest in the lease. He stated that the equipment for the Palek and Ziba wells was paid for shortly after it was purchased.

Jean Tober, the well operator, testified that he was paid by Minton, Sr. and that Minton, Sr. ordered him to do the work; that defendant McClement never in-

232

structed him to buy any of the equipment on any of the leases; that he received his orders from Minton, Sr. only, and that he got no orders from defendant McClement. He was the person who did the completion work, equipping and putting the well on pump. He saw defendant McClement on location, both on the Washington County wells and on the Belle Dial well in Hamilton County, though he stated that McClement was not at the Belle Dial lease many times. He testified that he was authorized by the Mintons to order equipment.

Albert Gentles, the drilling contractor, testified that he made contracts for drilling the wells while in defendant McClement's store; that both McClement and Minton, Sr. were present; and that both of them were together when he made the contract. He assumed he was drilling for both of them even though the well was carried in the name of Minton alone. He further testified that McClement, Minton, Sr. and he discussed the treatment of the well.

Defendant McClement testified that Minton, Sr. was attempting to pay him for his grocery bill by giving him an interest in the well; that there was no obligation to give him any definite interest on any of the wells and that the arrangements were that he was to give what assistance he could and in consideration of the grocery bill, he was to get some interest in the lease though Minton, Sr. could give him any amount that he wanted to, and that he could refuse to give him any interest whatsoever. He testified that when the interest was assigned to him, Minton, Sr. reserved complete control of management and operation and that he, McClement, had no part in that. He denied ever telling Rudrauff that they were partners. He said he felt like he was liable on the Palek lease and also on the Ziba lease. He further denied ever making a contract with Gentles, the well driller. He stated

233

that Minton, Sr. used his office, as he didn't have one of his own; that at the time he talked with Rudrauff, the only well he knew about was the Palek well and that he was guaranteeing credit for that well only. Other than helping to plan the situation on the Palek well, he did not perform any other services. He claimed that all he was trying to do was protect an interest in money that was owed by Minton, Sr., and that there is still a balance due him on the grocery account. He said he met Minton, Sr. through Minton, Sr.'s brother who worked for McClement; that at the time the Belle Dial well was being drilled, he did not know he was going to receive an interest in the lease and that there was no obligation of Minton, Sr. to assign him any interest in the lease; that there were no definite arrangements; that he did introduce Minton, Sr. to persons to whom fractional interests were sold but that this was confined to the Palek lease only and that he did not help him to sell any interests in the Belle Dial lease. He contended that he was helping Minton, Sr. get credit for equipment on the Palek well only.

Minton, Jr. testified that all the leases were taken in his name and when his father sold interests, he, the son, would execute the assignments. The money from the sale was deposited in his bank account, and he wrote checks to pay for the equipment. His own words were "My father run the whole show." He further testified that defendant McClement never exercised any control in the management or operation of the business, such as hiring men or buying equipment. He said his father was the sole operator, and that if his father did have a deal with defendant McClement he would have known about it.

Bernard Minton, an attorney, testified that he did work for Minton, Sr. in connection with the oil leases. He explained that Minton, Sr. acquired money to drill

234

by selling working interests of what is known as "et als" and that as far as he knew the assignments to defendant McClement on the Palek and Ziba wells were made after the wells were determined to be producing wells; that the proceeds from the salvage on the Palek and Ziba were not paid to defendant McClement nor either of the Mintons. Defendant McClement got nothing of the salvage on the Belle Dial either nor did Minton, Jr. nor the estate of Minton, Sr. though the other interest holders were paid. He stated that defendant McClement helped Minton, Sr. in getting the "et als" and that McClement did assist in the completion of the wells.

C. E. Ferguson, credit manager of plaintiff, testified that he oversaw the plaintiff's accounts. He explained the procedure of the company in extending credit to persons who wanted to buy equipment on credit. He stated that he was in Mt. Vernon, Illinois when Rudrauff called in Minton, Sr. in November, 1956. At that time, he typed up a note and had Minton, Sr. sign it, though the name turned out to read Omar Minton, Jr. He further said that he called defendant McClement in the summer or fall of 1956 and told him that he was looking for him to pay the account; that defendant McClement promised to give his assistance, though he didn't agree to pay the account. He stated that the account was set up as a running account with no specific leases specified. He stated that McClement never notified him that he wasn't liable on the Minton, Jr. account.

Based on the testimony as summarized in this opinion, the trial court found that the defendant Robert McClement was not liable for the items sold on the Belle Dial lease and entered judgment against him in the sum of only $80.31. By this appeal, we are asked to hold that these findings are against the manifest weight of the evidence and we are requested to enter

235

judgment against the defendant Robert McClement in the sum of $7,095.34. Plaintiff states "no useful purpose" would be served by remanding the case.

The findings were made by the trial court who heard and tried the case without a jury. Such findings are entitled to the same weight as a verdict of a jury. Cline v. Cline, 12 Ill App2d 231, 139 NE2d 828. When a jury is waived, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony, and no reversal will be ordered unless the judgment is against the manifest weight of the evidence. Friedman Elec. Co. v. St. Clair County Housing Authority of City of East St. Louis, 23 Ill App2d 16, 161 NE2d 473; Andrews v. Matthewson, 332 Ill App 325, 75 NE2d 123.

There was no proof whatsover that there was an actual express business partnership existing between the defendant McClement and the two Mintons insofar as the Belle Dial operations were concerned. There was no evidence that any of the parties among themselves agreed to a partnership arrangement. The defendant McClement denied there was a partnership and Minton, Jr. did not testify that there was an express partnership. The third party involved, Omar Minton, Sr., was dead at the time of the trial. We do not feel compelled to disturb the trial court's finding that there was no express partnership.

However, plaintiff resorts to the contention that there was a mining partnership which is somewhat different from the ordinary business partnership. In a mining partnership it must be shown that not only is there a joint ownership of the property but also a joint operation of the property or lease involved. 26 ILP Mining, Oil and Gas, sec 131, p 707. As this court stated in Dunbar v. Olson, 349 Ill App 308 on page 312, 110 NE2d 664 on page 666, "By joint operation is obviously meant that each of the joint owners

236

must have some choice and participation in control and management."

■ In the instant case, defendant McClement testified that he had no joint control or management. This was substantiated by Omar Minton, Jr. who said that McClement never exercised any control in the management or operation and that his father, Omar Minton, Sr., was the sole operator. Jean Tober, the well operator, testified that he received all his orders from Minton, Sr. and that he received no orders from defendant McClement. There was very little, if any, evidence in conflict with this, other than that defendant McClement was seen on the Belle Dial premises a few times and also that the drilling contractor thought that he was working for defendant McClement as well as Minton, Sr. In view of all the evidence, we cannot hold that the trial judge acted without ample support from the evidence in finding that there was no mining partnership.

We thus come to the estoppel theory relied upon by the plaintiff.

■ The only evidence to support the theory of estoppel is the fact that defendant McClement had engaged in two previous leases as a partner and that he didn't inform the plaintiff that he wasn't involved as a partner in the Belle Dial operation. Although liability may be imposed on the theory of an estoppel because a person, through silence, continues to hold himself out as a partner, the rule should only apply when there is nothing to put the person on notice of the termination of the partnership.

■ As this court said in Beasley v. American Surety Co., 243 Ill App 447 on page 449, "A party desiring to claim the benefit of an estoppel cannot shut his eyes to obvious facts or neglect information easily obtainable, and then charge his ignorance to others . . . One relying on estoppel must have exercised such rea-

sonable diligence as the circumstances of the case require." See also 40 Am Jur—Partnership, § 77, p 183.

In the instant case, there is evidence that plaintiff felt obliged to make inquiry of the status of the parties. The store manager testified that he and his district manager were talking with Minton, Sr. during the operation of the second lease and at that time inquired if the parties were still partners. They were then interested in sales on the third lease coming up, the Belle Dial lease. The defendant McClement wasn't present at the time and a reasonable inquiry would have called for confirmation from him also if his credit as a partner was to be relied upon. No such inquiry was made however and no justifiable reason appears why such inquiry was made of one party only and not the defendant McClement.

In order to rely on estoppel, the proof must be clear and unequivocal. 18 ILP Estoppel, sec 36, p 124. As we stated in Spence v. Washington Nat. Ins. Co., 320 Ill App 149 on page 154, 50 NE2d 128 on page 130, "In a case where such proof is proper, estoppel or waiver must be proven by clear, precise and unequivocal evidence."

We have carefully searched the record and cannot find such clear and unequivocal proof and we conclude that the findings of the trial court that there was no estoppel is not contrary to the manifest weight of the evidence.

Affirmed.

CULBERTSON and SCHEINEMAN, JJ., concur.