BLOCKER EXPLORATION COMPANY,
a Texas Corporation, Petitioner,

v.

FRONTIER EXPLORATION, INC., a
Colorado Corporation, Respondent.

FRONTIER EXPLORATION, INC., a
Colorado Corporation, Petitioner,

v.

BLOCKER EXPLORATION COMPANY,
a Texas Corporation, Respondent.

Nos. 85SC300, 85SC302.

Supreme Court of Colorado.

July 27, 1987.

Holt & Gebow, P.C., L. Tyrone Holt,
Thomas E. Gebow, Elsa D. Burchinow,
Denver, for Blocker.

Davis, Graham & Stubbs, Glen E. Keller, Jr., Glenn W. Merrick, Christopher L. Richardson, Denver, for Frontier.

VOLLACK, Justice.

In separate cases, the parties appeal from the court of appeals' holding in *Frontier Exploration, Inc. v. Blocker Exploration Co.*, 709 P.2d 39 (Colo.App.1985). Frontier Exploration, Inc. [hereinafter Frontier] appeals from the court of appeals' holding that because Blocker Exploration Company [hereinafter Blocker] and Lewis Energy Corporation [hereinafter Lewis] had not entered into a mining partnership, Blocker was not liable for Lewis' debt to Frontier. Blocker appeals from the court of appeals' holding that because Blocker did not file notice of cross-appeal on certain additional issues raised in its brief, Blocker had failed to file a timely notice of appeal and the appellate court did not have jurisdiction to address the additional issues. The two cases are consolidated for purposes of appeal. On the mining partnership issue, we affirm the court of appeals' decision. We disapprove the court of appeals' conclusion on the timely notice of appeal issue.

## I.

This dispute arises from a series of agreements concerning the exploration and development of oil and gas leases in the State of Michigan. In January 1981, Lewis entered into an agreement with Great Lakes Niagaran [hereinafter GLN] whereby GLN assigned its rights in certain Michigan oil and gas leases to Lewis. The GLN–Lewis agreement designated Lewis as the operator for exploration and development of the leases, and provided that Lewis and GLN would enter into an operating agreement before any drilling began. An unexecuted operating agreement was appended to the GLN–Lewis agreement. In exchange, GLN received a reversionary 15% working interest.

In February 1981, Lewis entered into an agreement with Frontier. Frontier was to conduct seismic work on the Michigan leases,[1] in exchange for fees and expenses as set out in the agreement.

In March 1981, Lewis assigned a portion of its interest in the Michigan leases to Blocker. The Lewis-Blocker agreement gave Blocker a 25% working interest; in exchange, Blocker agreed to contribute certain sums to overhead, pay one-third of Lewis' out-of-pocket expenses for the reconnaissance seismic program, up to $750,000 (and one-fourth of such costs thereafter), and 25% of the costs incurred for the detailed seismic survey if Blocker elected to participate in that stage of the exploration and development. Blocker and Lewis also agreed to share data and interpretation. Finally, the agreement provided that unless otherwise indicated, the parties' rights would be governed by the GLN–Lewis contract.

Frontier performed the reconnaissance seismic work for Lewis, from March through September of 1981. In February 1982, Lewis filed bankruptcy. At that time, Frontier had only been paid a portion of the fees it was owed for the seismic work it had performed under the Lewis-Frontier agreement. Unable to satisfy the outstanding debt through Lewis' bankruptcy proceeding, Frontier filed suit against Blocker, claiming that Blocker was liable for Lewis' debts because a mining partnership existed between Lewis and Blocker.

Frontier and Blocker both filed motions for summary judgment, with Frontier alleging that a mining partnership existed by operation of law, and Blocker contending that such a partnership did not exist.

Based on the agreements presented by the parties (which were not disputed), the trial court granted Blocker's motion for summary judgment. The trial court held that because one of the required elements of a mining partnership—namely, joint operation—was absent, no mining partnership existed. The trial court did not rule on the

1. At this time, Lewis also assigned a portion of its interest to Roxy Resources, Inc., but Roxy and Lewis' successor-in-interest reached a settle- ment, and Roxy is no longer a party in the lawsuit.

issues of laches and estoppel, Frontier's election to treat Lewis as solely liable for the debt, and the absence of Blocker's ratification of a prepartnership debt; Blocker raised these alternative issues in its defense.

Frontier appealed, seeking reversal of the trial court's entry of summary judgment on the mining partnership issue. Blocker did not file notice of cross-appeal. However, in its answer brief, Blocker raised in its defense the issues not decided by the trial court: laches and estoppel, Frontier's election to treat Lewis as solely liable for the debt, and the absence of Blocker's ratification of Lewis' prepartnership debt. The court of appeals affirmed the trial court's order of summary judgment on the mining partnership issue, but declined to address the additional and alternative issues raised by Blocker because Blocker had not filed notice of cross-appeal.

Blocker and Frontier separately filed petitions for writ of certiorari to this court. We granted both petitions and consolidated the cases.

## II.

### A.

#### Elements of Mining Partnership

"Mining Partnerships developed as a special type of partnership peculiarly adapted to serve the mining industry (including the oil and gas field)." *Mud Control Laboratories v. Covey*, 2 Utah 2d 85, 91, 269 P.2d 854, 858 (1954). Mining partnerships have been recognized for the purpose of "impos[ing] joint and several liability on non-operating interest owners in favor of third parties transacting business with or injured by a mineral venture." Boigon & Murphy, *Liabilities of Nonoperating Mineral Interest Owners*, 51 U.Colo.L.Rev. 153, 154 (1980). Oil and gas partnerships are treated as a type of mining partnership for purposes of analysis.

▪ The three essential elements of a mining partnership are: (1) joint ownership; (2) joint operation; and (3) an express or implied agreement to share profits and losses. *Mud Control Laboratories*, 2 Utah 2d at 91–92, 269 P.2d at 858. This mining partnership test has been adopted in the jurisdictions which have addressed this issue. *Gilroy v. White Eagle Oil Co.*, 201 F.2d 113 (10th Cir.1952) (applying Oklahoma law); *Gilbert v. Fontaine*, 22 F.2d 657, 661 (10th Cir.1927) (applying Kansas law); *Edwards v. Hardwick*, 350 P.2d 495, 501–02 (Okla.1960); *Lyons v. Stekoll*, 186 Okla. 94, 96 P.2d 60 (1939). *See* Fiske, *Mining Partnership*, 26 Inst. on Oil & Gas L. & Tax'n 187, 193 (1975).

If a mining partnership exists, the partners are characterized as operators and have a limited power (less than the power of a general partner) to bind other members of the partnership. *Smaller v. Leach*, 136 Colo. 297, 313, 316 P.2d 1030, 1040 (1957). Frontier asks us to find that Lewis and Blocker were partners, and that Lewis had the power to bind Blocker, leaving Blocker liable on the Lewis-Frontier contract.

The parties conceded the existence of joint ownership. The record shows, and the parties do not dispute, that Lewis and Blocker agreed to share profits and losses. The element of joint operations is the critical issue presented by these facts.

### B.

#### Joint Operations

As pointed out by the court of appeals, other jurisdictions have formulated various standards for determining what constitutes joint operation. Co-ownership alone does not give rise to a mining partnership. *Williston Oil & Gas Co. v. Phoenix Ins. Co.*, 271 F.2d 745, 746 (10th Cir.1959) (applying Wyoming law). All investors are not mining partners by virtue of holding a working interest in an oil or gas lease. *Dunbar v. Olson*, 349 Ill.App. 308, 110 N.E.2d 664 (1953). The court of appeals correctly held that "the determining factor is related to the degree of *active participation in control or management* of the venture that is exercised by a co-tenant or co-owner." *Frontier Exploration, Inc.*, 709 P.2d at 42 (emphasis added).

The issue then becomes: what rights and actions of co-owners rise to the level of active participation in control or management, rendering them mining partners and not mere co-owners or investors?

Texas has held that the right of a co-owner to give counsel to the company does not make the co-owner a partner. *Templeton v. Wolverton,* 142 Tex. 422, 179 S.W.2d 252 (1944). Nor does the right to approve certain expenditures, the right to take in kind, or the right of access to the site. *Ayco Dev. Co. v. G.E.T. Serv. Co.,* 616 S.W.2d 184 (Tex.1981); *Youngstown Sheet & Tube Co. v. Penn,* 355 S.W.2d 239 (Tex. Civ.App.1962), *modified,* 363 S.W.2d 230 (Tex.1963). In *Berchelmann v. Western Co.,* 363 S.W.2d 875 (Tex.Civ.App.1962), the appellants were held not liable as partners because "the very operating agreements themselves, wherein appellants were designated as the 'non-operators' and Texita as the 'operator' do not contain the basic elements of sharing of liability, control, risk and profits, along with the elements of agency, necessary to constitute a partnership or mining partnership." *Id.* at 876–77. Other factors in *Berchelmann* included the non-operators' contribution of a portion of the operator's expenses (while the operator controlled drilling and production), the operator's exclusive management and control of operations, and the fact that the operator's purchase of labor and materials was charged to accounts in the operator's name only. *Id.* at 877. The Texas Court of Appeals has held that joint operation was not established by proof that the non-operator counseled the operator, was present at the well and interested in the drilling results, and knew there was a contract which failed to authorize the operator to create liability to third parties binding on the non-operator. *U.S. Truck Lines v. Texaco, Inc.,* 337 S.W.2d 497, 500 (Tex.Civ.App. 1960).

Oklahoma has held that the assignee of an interest in an oil and gas lease was not liable to a third party creditor as a mining partner because his actions did not amount to "actively joining in the promotion, conduct or management of the joint venture." *Edwards v. Hardwick,* 350 P.2d 495, 502 (Okla.1960). The non-operator had contributed use of equipment, which he had authorized to be ordered while he was present at the well. *Compare Oklahoma Co. v. O'Neil,* which involved a dispute between co-owners in a venture. The same court there found that a partnership existed, even though "[t]he only cooperation by the defendants reflected by the record in this case [was] the visit to and the examination of the leases by the defendants ... shortly prior to the purchase of the leases. Subsequent cooperation by the defendants appears to have been minimal." 440 P.2d 978, 985 (Okla.1968). This evidence was held sufficient to uphold the trial court's holding that a mining partnership existed, even though "the defendants left the management and operation of the leases to the plaintiff." *Id.*

Illinois has held that co-owners "never exercised any control in the management or operation," when the non-operator did not give orders, hire personnel, or buy equipment, and was only on the premises a few times. *Bovaird Supply Co. v. McClement,* 32 Ill.App.2d 224, 234, 177 N.E.2d 430, 434 (1961). In *Dunbar v. Olson,* Illinois declined to find a mining partnership where the non-operators "knew nothing about the operations other than" what the operator told them, were not "oil men," and did not have skill or knowledge in oil exploration. 349 Ill.App. at 310, 110 N.E.2d at 665.

In a dispute between co-owners, the Tenth Circuit Court of Appeals applied Oklahoma law and found existence of a mining partnership where the non-operator furnished funds and materials, made many trips to the field, personally wrote letters asking the operator to keep expenses down, and the general plan was for the operator and non-operator "both to counsel together." *Dana v. Searight,* 47 F.2d 38, 41 (10th Cir.), *cert. denied,* 283 U.S. 856, 51 S.Ct. 649, 75 L.Ed. 1462 (1931).

Kansas found existence of a mining partnership, and permitted a third party creditor to recover from all five co-owners of a well in *Mountain Iron & Supply Co. v. Branson,* 134 Kan. 818, 8 P.2d 407 (1932).

The five co-owners shared regularly in production, used materials bought from the plaintiff-third party creditor for two years without payment, and paid wages to their hired employee individually on a pro rata basis.

A review of these cases makes it clear that the "joint operations" question requires application of the mining partnership test on a case-by-case basis.

### C.

#### Joint Operations Test

■ The test to determine whether the joint operations element is met requires a court to look at the express agreement between the parties and, in some cases, the actions and conduct of the co-owners. If a co-owner takes an active role in the conduct of operations of a mining venture, and the other two elements of the mining partnership test are met, then a mining partnership does exist.

If there has not been actual control or participation by the co-owners, then it must be determined whether there was an express agreement between the parties and, if so, whether the agreement gave the co-owners a right of participation in the management or control of the operation. If no agreement exists, or the agreement does not give a co-owner the right to actual control or participation, then no mining partnership exists. However, if the agreement gives a co-owner a right of actual control or participation there may be joint operations, even if the rights described in the agreement have not been exercised by the co-owner.[2]

Here, the parties did not allege that there was any conduct by the co-owners outside the rights set forth in the agreement. To determine whether the joint operations element was met, we must look at the rights and responsibilities as set out by the two agreements, and decide whether they constitute actual participation in control or management.

The pertinent provisions of the Lewis-Blocker letter agreement provided as follows: Lewis would "conduct a reconnaissance seismic program" and make the resulting data available to Blocker. After "consultation with [Blocker]," Lewis would "undertake a detailed seismic investigation to establish drilling prospects." After investigating, Lewis would "undertake and manage a drilling program as contemplated by the Lewis-GLN agreement." Other provisions governed Blocker's payments to Lewis and Blocker's contributions to overhead and to the reconnaissance seismic program costs. Blocker had the choice whether to proceed or withdraw from the project at this stage. "Blocker will contribute to

---

**2.** This approach has been followed in other jurisdictions: *Dana v. Searight*, 47 F.2d 38 (10th Cir.), *cert. denied*, 283 U.S. 856, 51 S.Ct. 649, 75 L.Ed. 1462 (1931) (co-owners entered into a written agreement; court relied on co-owners' conduct in holding that mining partnership existed); *Vicioso v. Watson*, 325 F.Supp. 1071 (D.Ca.1971) (where agreement gave co-owners the right to exercise control, a mining partnership existed even if the co-owners did not actually exercise their rights of control); *Bovaird Supply Co. v. McClement*, 32 Ill.App.2d 224, 177 N.E.2d 430 (1961) (where there was no express agreement, and the co-owners' conduct did not show joint control or management, mining partnership did not exist); *Dunbar v. Olson*, 349 Ill.App. 308, 110 N.E.2d 664 (1953) (where there was no express agreement and no evidence of joint operation, no mining partnership existed); *Arrow Petroleum Co. v. Ames*, 128 Ind.App. 10, 142 N.E.2d 479 (1957) (terms of agreements established that co-owners were mining partners, even if the rights were not actually exercised); *Berchelmann v. Western Co.*, 363 S.W.2d 875 (Tex.Civ.App.1962) (where language of agreement does not contain basic elements of a mining partnership, and actions and conduct did not demonstrate a mining partnership, co-owners held not liable for debts incurred by operator); *U.S. Truck Lines v. Texaco*, 337 S.W.2d 497 (Tex.Civ.App.1960) (where agreement expressly negated any intent to create a partnership, and rights set out in contract did not amount to a partnership, no mining partnership existed); *Youngstown Sheet & Tube Co. v. Penn*, 355 S.W.2d 239 (Tex.Civ.App.1962) (construction of operating agreement is a question of law: agreement held not to constitute a partnership because it did not provide for joint operation of the leases); *Mud Control Laboratories v. Covey*, 2 Utah 2d 85, 260 P.2d 854 (1954) (mining partnership existed because terms of agreement showed that co-owners enjoyed rights of control "beyond what mere investors ordinarily have," resulting in "power to exercise a considerable degree of control over the operation." *Id.* at 91, 269 P.2d at 858).

Lewis 25% of its out-of-pocket costs incurred for the detailed seismic survey, *if you elect to participate in such a program.*" (Emphasis added.) Finally, the agreement provided that Blocker's rights "except to the extent in this letter agreement expressly otherwise provided, shall be governed by the Lewis-GLN Agreement."

The GLN–Lewis agreement expressly designated Lewis as "the operator." Lewis agreed to provide information to GLN regarding the drilling permits, drilling reports and progress, and evidence from "the operator" regarding the testing and showings of oil and gas. The GLN–Lewis agreement also gave GLN the right to require "the operator" to carry insurance. Lewis was responsible for the reconnaissance seismic program, and entered into a contract with Frontier to have that work done. Lewis agreed to undertake a detailed seismic investigation to establish drilling prospects and to undertake and manage the drilling program.

Blocker agreed to contribute certain sums to overhead and seismic program costs, and to a detailed seismic survey, if Blocker elected to participate at that stage. Blocker had the right to receive "all data and all interpretations" and the right to be consulted before detailed seismic investigations, if any, were established. By incorporation of the GLN–Lewis agreement, Blocker also had access to regulatory reports, daily drilling reports, logs, core samples, and the right to be present at the site.

We agree with the court of appeals' holding that these facts do not support Frontier's argument that Blocker's rights rose to the level of active participation in control or management. Rather, Blocker invested funds, and enjoyed the right to receive data and to elect whether to continue participation in particular phases of the exploration or development. "[A] non-operating working-interest [member] should not be considered, without more, a mining partner if his only rights are to take in kind, receive reports, inspect books, make an election of whether to join in a particular phase of exploration/development (commonly known as a 'go-no-go' decision), or

has the right of approval of specified expenditures." *Frontier Exploration, Inc.,* 709 P.2d at 42–43.

Blocker's role was that of an investor, not a partner; the rights to receive certain data, to have access to the site, and to be consulted do not convince us that Blocker actively controlled the exploration. Blocker had no power to veto Lewis' decisions, did not enter into any contracts on behalf of the alleged partnership, and only enjoyed the right to make a "go-no-go" election at a certain stage of the exploration. We agree no mining partnership existed here.

### D.

### *Summary Judgment*

The trial court granted summary judgment on the mining partnership issue. C.R. C.P. 56 permits entry of a summary judgment order where there is "no genuine issue of any material fact necessary for the determination of the question of law." C.R.C.P. 56, 7A C.R.S. (1986). Whether there is a genuine issue of material fact can be ascertained from the pleadings, affidavits, and depositions. *Bailey v. Clausen,* 192 Colo. 297, 557 P.2d 1207 (1976). Where the judge's task is to apply the law to undisputed facts, summary judgment is proper.

The construction and interpretation of a written contract is generally a question of law to be determined by the court. *Pepcol Mfg. Co. v. Denver Union Corp.,* 687 P.2d 1310, 1313 (Colo.1984). Where a written instrument is evidence of an agreement, the effect of the agreement is a matter of law. *International Technical Instruments, Inc. v. Engineering Measurements Co.,* 678 P.2d 558, 561 (Colo.App.1983). " 'The existence of a partnership in a given case is a question of fact depending for its solution upon inferences to be drawn from the evidence adduced, but *the question whether ascertained facts constitute a partnership is one of law.*' 40 C.J. 1147." *Mountain Iron & Supply Co. v. Branson,* 134 Kan. 818, 822, 8 P.2d 407, 409 (1932) (emphasis added).

Blocker and Frontier each requested summary judgment in reliance on the same argument: that the undisputed facts did or did not establish, as a matter of law, the rights and responsibilities that would show existence of a mining partnership.[3] The trial court ruled on the basis of the written agreements and the pleadings, affidavits and depositions, and the parties did not dispute the documents provided to the court. Because there was no genuine issue of material fact, and the judge's task was to determine, from the undisputed facts, whether a mining partnership existed as a matter of law, summary judgment was proper in this case. We uphold the court of appeals' affirmance of the trial court's order of summary judgment.

### III.

The second issue is whether the court of appeals correctly concluded that it did not have jurisdiction to address the additional issues raised by Blocker because of the absence of a cross-appeal.

The general rule is that an appellee must file a cross-appeal in order for an appellate court to consider an alleged error of the trial court which prejudiced the appellee. *City of Delta v. Thompson,* 37 Colo.App. 205, 207, 548 P.2d 1292, 1294 (1975). The United States Supreme Court has described a limitation on this rule, holding that an appellee "may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it." *United States v. American Ry. Express Co.,* 265 U.S. 425, 435, 44 S.Ct. 560, 564, 68 L.Ed. 1087 (1924).

■ Adopting this limitation of the general rule, the court of appeals in *City of Delta* held that "an appellee may, without the filing of a motion for new trial or a notice of cross-appeal, raise arguments in support of his judgment which would not

increase his rights under the judgment, whether or not the trial court has ruled on those arguments." *Delta,* 37 Colo.App. at 208, 548 P.2d at 1294–95. This rule has been applied in a number of cases. *Adams v. Leidhol[d]t,* 38 Colo.App. 463, 468, 563 P.2d 15, 18 (1976), *aff'd,* 195 Colo. 450, 579 P.2d 618 (1978) (even though defendant doctor had not filed a cross-appeal arguing the statute of limitations, court would permit such argument because the defendant is entitled to raise "any legal theory in support of the trial court's judgment"); *State v. Morrell,* 687 P.2d 1319, 1320 (Colo. App.1984) (where widow did not seek to enlarge her rights under the judgment by raising waiver argument, issue is properly before appellate court). Applying these legal principles, we conclude that the court of appeals erred in holding that it could not address Blocker's alternative arguments.

The alternative arguments raised in Blocker's answer brief were laches and estoppel, Frontier's election to treat Lewis as solely liable, and the absence of ratification of a prepartnership debt. If the trial court had concluded that a mining partnership did exist between Lewis and Blocker, the above theories might have precluded Blocker's liability on Lewis' contract. These arguments would not have "increased [Blocker's] rights under the judgment." Rather, they were alternative arguments on which the court could have based its decision, but did not. Under the principles discussed above, Blocker was not required to file a cross-appeal in order to raise these arguments.

We affirm the court of appeals on the mining partnership issue, but disapprove of the court of appeals' conclusion on the cross-appeal issue.

QUINN, C.J., dissents.

QUINN, Chief Justice, dissenting:

The majority acknowledges that where an express agreement provides for a right to participate in the management or control

---

**3.** By pointing this out, we do not suggest that a case is appropriate for summary judgment merely because all parties request summary judgment. The test is whether there are genuine issues of material fact, and the conclusion that there were no issues of fact was ascertained from the documents described in this case.

of the mining operation, the absence of any actual exercise of that right should not preclude a finding that the joint operation element of a mining partnership exists. 740 P.2d at 987. However, the majority then concludes that under this standard Blocker Exploration Company's rights did not rise to the level of active participation in control or management. I disagree with this conclusion, and accordingly dissent from that portion of the majority opinion holding that summary judgment was properly entered in favor of Blocker on the issue of a mining partnership. Because I would return the case to the trial court for resolution of factual issues relating to the mining partnership, I would not decide here whether Blocker was required to file a cross-appeal in order to raise in support of summary judgment various issues not addressed by the trial court.

## I.

As the majority correctly states, in a case such as this where there has been no actual control or participation by the co-owners in a mining venture, the critical issue is the extent to which the express agreement between the parties gives a right of participation in the management or control of the operation to the party whose status as a mining partner is in dispute. If the agreement does give a co-owner a right to participate in management or control that goes beyond such rights as are merely incident to co-ownership, it may justifiably be concluded that the joint operation element of a mining partnership has been satisfied, regardless of whether the rights provided for in the agreement were actually exercised. This approach has been followed by other courts. *See, e.g., Vicioso v. Watson,* 325 F.Supp. 1071 (C.D.Cal.1971); *Ayco Development Corp. v. G.E.T. Service Co.,* 616 S.W.2d 184 (Tex.1981); *Mud Control Laboratories v. Covey,* 2 Utah 2d 85, 269 P.2d 854 (1954); *see also Shell Oil Co. v. Prestridge,* 249 F.2d 413, 417 (9th Cir. 1957) (although there was some evidence that Shell had exercised actual control over the drilling, "under the provisions of the agreement alone there was sufficient joint control of the enterprise" to establish a

joint venture as a matter of law); *see generally* Boigon and Murphy, *Liabilities of Nonoperating Mineral Interest Owners,* 51 U.Colo.L.Rev. 153, 164–72 (1980). As Judge Babcock observed in his dissent to the court of appeals' opinion in this case, "parties to mining ventures are free to limit their liability by the express terms of [their agreement]," and "[o]ne who contracts voluntarily for the right of involvement or participation in the control or management of a mining venture should be liable for the debts of the partnership, whether that right is exercised or not." *Frontier Exploration, Inc. v. Blocker Exploration Co.,* 709 P.2d 39, 43 (1985) (Babcock, J., dissenting).

Indeed, some commentators have defined a mining partnership as "a partnership relation imposed by law, independent of, and often antagonistic to, express contractual declarations, which even in modern courts is invoked to impose joint and several liability on nonoperating interest owners in favor of third parties transacting business with or injured by a mineral venture." Boigon and Murphy, 51 U.Colo.L.Rev. at 154. This definition is considerably more expansive than the traditional "right to control" test. In my view, however, summary judgment was improper in this case even under the more restrictive "right to control" test.

## II.

Although the record does not indicate that Blocker actively participated in the management or control of the exploration activities on the leases, the record does contain the express agreement setting forth the terms and conditions under which Lewis and Blocker were to join together to exploit the opportunities presented by the Lewis-GLN agreement. The agreement between Lewis and Blocker states that Lewis was to convey to Blocker a twenty-five percent interest in leases it acquired from GLN, in exchange for which Blocker agreed to pay Lewis the following amounts: $364,129.57 for its interest in the initial leases; a percentage of the amount paid by Lewis to GLN for other interests; a percentage of Lewis's out-of-pocket ex-

penses; $2,500 per month towards Lewis's overhead for seismic programs; and up to $250,000 towards the reconnaissance seismic program. It also contains the following provisions:

2. *Reconnaissance Seismic Program.*

Lewis will conduct a reconnaissance seismic program in the area of mutual interest, the extent and nature of such program to be determined by Lewis. All data and all interpretations made by Lewis will be available to you [Blocker] and you will make available to Lewis all interpretations made by you or at your direction.

3. *Detailed Seismic Investigation.*

After completion of the reconnaissance seismic program, Lewis will, after consultation with you, undertake a detailed seismic investigation to establish drilling prospects, if, and to the extent indicated by, the reconnaissance program.

4. *Drilling Program.*

Thereafter, Lewis will, to the extent indicated, undertake and manage a drilling program as contemplated by the Lewis-GLN Agreement.

\*   \*   \*   \*   \*   \*

8. *Detailed Seismic Contribution.*

Blocker will contribute to Lewis 25% of its out-of-pocket costs incurred for the detailed seismic survey, if you elect to Participate in such a program.

Paragraph eleven further states that Blocker's rights under the agreement "shall be governed by the Lewis-GLN Agreement." The Lewis-GLN agreement provides in pertinent part as follows:

8. In connection with the drilling of any well upon lands covered by the Leases, Lewis agrees to furnish, or cause to be furnished, to GLN the following information:

(a) A copy of the permit to drill, the surveyor's location plat, and all reports and forms filed with all regulatory authorities relating to the drilling, testing, completing, or abandoning of such wells; and

(b) To furnish by mail, or telephone if requested, daily drilling reports and full information relative to the drilling progress of each such well; and

(c) To permit GLN's employees, agents or representatives to have access to the derrick floor at all times, at their sole risk, and to furnish complete information relative to all cuttings and cores taken and drill stem tests or other tests made; and

(d) Upon request, to save samples of all cuttings and cores marked with the depth from which they came and to deliver same to representatives of GLN at the well (this provision shall create no obligation to make cuttings or to take cores); and

(e) To furnish evidence that the operator has adequately tested each prospective productive formation and all showings of oil and gas which may be encountered which would be tested by a reasonable and prudent operator, and otherwise, to make bonafide efforts to complete each such well as a well capable of producing oil and/or gas in paying quantities; and

(f) To notify the representatives of GLN reasonably in advance so that it can have representatives present when any logging, coring or drill stem test or production test is to be made; and

(g) Upon completion of each well, to furnish two (2) copies of all logs, core records, analysis, drill stem and production tests as satisfactory evidence of the depth drilled.

\*   \*   \*   \*   \*   \*

In addition each party shall promptly furnish to the other all seismic data acquired by it in the area of mutual interest, as defined below.

Although the contractual provisions of the Lewis-Blocker agreement do not expressly set forth Blocker's rights against Lewis in the event of Lewis's noncompliance, there are at least sufficient ambiguities in the agreement to justify the admission of extrinsic evidence on the meaning of various contractual provisions as they relate to Blocker's right of control. *See Pepcol Manufacturing Co. v. Denver Union Corp.,* 687 P.2d 1310 (Colo.1984); *Union Rural Electric Ass'n v. Public Utili-*

*ties Comm'n,* 661 P.2d 247 (Colo.1983). For example, it is not clear whether the phrases "after consultation with you [Blocker]" in paragraph three and "to the extent indicated" in paragraph four mean that Blocker had an actual veto power over Lewis's decisions in regard to these matters, or whether—as suggested by paragraph eight—Lewis could in fact proceed with the detailed seismic survey over Blocker's objection, but would then be obligated to look elsewhere to fund the survey. Moreover, it is at least arguable that the Lewis-GLN agreement contemplated that GLN (and thus Blocker) was to have some right to participate in the control or management of Lewis's exploration activities.

Summary judgment is proper only where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. C.R.C.P. 56(c). The fact that both parties relied on the express terms of the agreement in their respective motions for summary judgment is no reason, in my view, to disregard the ambiguous nature of the contractual provisions on the critical issue of Blocker's right to participate in the management or control of the exploration activities. Since the operative contractual language is ambiguous in regard to this issue, I would reverse the judgment and direct that the case be remanded to the court of appeals with directions to return the case to the trial court so that that court may receive evidence clarifying the ambiguities, and may then determine whether the contractual provisions gave Blocker a right of control sufficient to satisfy the element of joint operation.